In re the GHR COMPANIES, INC.,
f/k/a Good Hope Industries,
Inc., Debtor.

In re GHR ENERGY CORP., f/k/a
Good Hope Refineries, Inc., Debtor.

In re SOUTHERN STATES,
INC., Debtor.

In re SOUTHERN STATES EXPLORA-
TION, INC., Debtor.

In re LAREDO EXPLORATION,
INC., Debtor.

In re GHR PIPELINE CORP., f/k/a
Southern Pipe Line Corporation,
Debtor.

In re SOUTHERN PETROLEUM
TRADING CO., LTD., Debtor.

Bankruptcy Nos. 4–83–00060–G, 4–83–
00056–G, 4–83–00093–G, 4–83–00094–G,
4–83–00095–G, 4–83–00092–G and 4–83–
00136–G.

United States Bankruptcy Court,
D. Massachusetts.

July 1, 1985.

Stephen Gordon, McGabe/Gordon, Boston, Mass., for Good Hope Energy Corp.

Charles Glerum, Choate, Hall & Stewart, Boston, Mass., for Continental Illinois Nat. Bank & Trust Co. of Chicago agent for debtors' secured bank creditors.

Sumner Darman, Silverman & Kudisch, Boston, Mass., for GHR Companies.

Joseph Braunstein, Riemer & Braunstein, Boston, Mass., for Creditors Committee GHR Energy.

Van Oliver, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., Creditors Committee GHR Pipeline Corp., Southern States, Inc., So. States Exploration, Inc.

Mark N. Berman, Widett, Slater & Goldman, Boston, Mass., pro se.

## MEMORANDUM AND ORDER RE BANKRUPTCY COURT'S APPROVAL OF A FEE DISPUTE COMPROMISE AS REMANDED FROM THE DISTRICT COURT

PAUL W. GLENNON, Bankruptcy Judge.

This matter comes before the Court on remand from the district court for further development of the record and for a statement of the bankruptcy court's reasons for approving the compromise of an attorneys' fee dispute.

### FACTS

1. On October 31, 1975, the GHR Companies, Inc., then known as Good Hope Industries, Inc., GHR Energy Corp., then known as Good Hope Refineries, Inc., GHR Pipeline Corp., then known as Southern Pipe Line Corporation, and two other affiliated corporations ("the old debtors") filed for protection under Chapter XI of the former Bankruptcy Act. During those proceedings, which resulted in confirmed plans of arrangement in May, 1980, the Boston law firm of Widett, Slater & Goldman, P.C. ("WS&G") served as co-counsel to the old debtors.

2. Following confirmation of their plans of arrangement, the old debtors continued to employ WS&G as their bankruptcy counsel. WS&G also represented the old debtors and several other affiliated corporations and entities on financing, general business and corporate matters.

3. From March 1, 1979, until his resignation from WS&G on March 4, 1983, Stephen F. Gordon ("Attorney Gordon") was the attorney at WS&G in charge of all matters concerning the Debtors, their affiliated corporations and related entities. In that capacity, Attorney Gordon engaged many lawyers at WS&G to work on the Debtors' legal problems. One of those so engaged was Richard L. Wise ("Attorney Wise"), an associate at WS&G. At the time of their Chapter 11 filings, Attorney Wise was the assistant clerk or assistant secretary of each of the Debtors.

4. On January 26, 1983, GHR Energy Corp. filed for protection under Chapter 11 of the Bankruptcy Code. Subsequently, Chapter 11 Petitions were filed on behalf of The GHR Companies, Inc. on January 27, 1983, GHR Pipeline Corp., Southern States, Inc., Southern States Exploration, Inc. and Laredo Exploration, Inc. on February 10, 1983 and for Southern Petroleum Trading Company, Ltd. on February 25, 1983. A proceeding was commenced by GHR Transmission Corp. on January 18, 1984. (Hereinafter all of the foregoing corporations will be referred to as "the Debtors"). The Debtors had been experiencing significant financial problems.

5. A controversy between the Debtors and WS&G arose when the Debtors failed to pay interim attorneys' fees to WS&G as authorized by the bankruptcy court in an order issued on August 24, 1983. At the root of the controversy was a payment by the Debtors to WS&G of $200,000.00 made on or about January 14, 1983 ("the $200,-000 payment"), just prior to the Debtors filing of their Chapter 11 petitions. At issue between the parties was the nature of the $200,000 payment. The Debtors asserted that the entire payment was a retainer; whereas, WS&G implied in its first application for attorneys' fees, filed on June 21, 1983, that only $64,450.30 of that payment had been reserved as a retainer while the remainder had been applied to the Debtors' outstanding debt.

6. In early January 1983, Attorney Gordon, the WS&G attorney in charge of all the Debtors' matters handled by WS&G, had one or more discussions by telephone with the Debtors' owner, John R. Stanley ("Mr. Stanley"), about the possibility of the Debtors filing for bankruptcy. According to the affidavits of Attorney Gordon and Mr. Stanley, it had been represented to Mr. Stanley by Attorney Gordon that WS&G would be unable to represent the Debtors in a subsequent bankruptcy unless a substantial amount of money was received

from the Debtors by WS&G prior to the petition filings. It was also stated in the affidavits that Gordon had not mentioned outstanding bills for past services during the telephone conversations and that Stanley understood Attorney Gordon's request to be for a retainer for services to be rendered in connection with the impending bankruptcy filings. At no time during those conversations, however, did either Attorney Gordon or Mr. Stanley expressly indicate that the advance payment was to be a retainer.

7. On January 14, 1983, WS&G received a wire transfer in the amount of $200,000. The wire transfer was made from a pooled account into which the Debtors as well as many of their affiliated corporations and entities deposited funds.

8. At the direction of Attorney Gordon, the WS&G bookkeeper applied the $200,000 wire transfer in the following manner: $135,549.70 was allocated to certain bills of the Debtors, their affiliated corporations and related entities, which bills were then current or outstanding. The balance of the wire transfer, $64,450.30, was applied as a retainer to a "new matter."

9. At about the same time as it received the $200,000 wire transfer, WS&G received a check, also in the amount of $200,000, made payable to WS&G and drawn on the account of GHR Energy Corp.

10. The $200,000 check was never deposited by WS&G. Instead, it was replaced by the $200,000 wire transfer.

11. The $200,000 check contained the notation "Legal Fees on Account". This was the only written instruction received by WS&G regarding either the $200,000 check or the $200,000 wire transfer.

12. Other than the notation on the $200,000 check, WS&G never received any oral or written instructions from the Debtors or from anyone on their behalf, as to how the $200,000 wire transfer was to be applied.

13. Shortly after the $200,000 payment had been wired to WS&G, the Debtors began to file their petitions. During the Chapter 11 proceedings and until March 4, 1983 WS&G acted as the Debtors' general bankruptcy counsel. On March 4, 1983, Attorney Gordon resigned from WS&G and established the Boston law firm of McCabe/Gordon.

14. Upon his departure from WS&G, Attorney Gordon took with him the representation of the Debtors and their affiliated corporations and related entities. Thereafter McCabe/Gordon was authorized to act as the Debtors' counsel in these proceedings. After McCabe/Gordon took over as Debtors' counsel, WS&G continued to perform services for the Debtors as their special counsel pursuant to Court order.

15. There have been two plans of reorganization filed in these Chapter 11 proceedings. The first plan was filed by the Debtors and the other by the bank group and creditors' committees.

16. Both plans call for payment to unsecured creditors of 100 percent of their general unsecured claims, plus interest running from the date the Chapter 11 petitions were filed. Although no court has ruled on either of the aforementioned plans, Attorney Gordon, the financial and legal quarterback for the Debtor, voiced his point of view on the feasibility. He stated that on a legal basis, the Debtors' plan is feasible.

17. On June 21, 1983, WS&G filed its first application for interim fees seeking an allowance of $108,393.50 plus $22,532.97 in expenses, less a retainer of $64,450.30. After hearings in June and July, the application was taken under advisement along with the many others submitted by various other counsel.

18. On August 24, 1983, the bankruptcy court awarded varying allowances to all counsel. WS&G was awarded $25,000 in fees, net of the claimed retainer of $64,450.30, and $22,532.97 in expenses, for a combined award of $47,532.97.

19. Although the Debtors made the ordered payments to all other counsel, WS&G was not paid the $47,532.97 as ordered. Accordingly, WS&G filed, on October 27,

1983, a motion to compel payment of the interim allowance, which included prayers for the award of interest to WS&G and for the imposition of other appropriate sanctions upon the Debtors.

20. The Debtors opposed the motion on the grounds that they had already paid WS&G the ordered sum by way of a $200,000 retainer, paid on January 14, 1983.

21. Prior to the entry of the bankruptcy court's August 24, 1983 fee award order, there had been no objection to WS&G's fee application. After entry of the order, there had been no appeal or request for reconsideration of the order. Yet, the Debtors based their objection to WS&G's motion to compel on the assertion 1) that the retainer mentioned in the fee application was inaccurate, 2) that WS&G had failed to file the statement required to be filed under 11 U.S.C. § 329(a) which would enable the parties to commence an analysis of the $200,000 payment, and 3) that consideration of the motion to compel payment would be premature prior to WS&G's compliance with § 329(a).

22. A hearing was held on November 15, 1983 on the motion to compel payment, but no evidence in the form of affidavits or oral testimony was presented. The motion was not decided at that time, and subsequent to the hearing, the Debtors filed a cross-motion, to which were attached the two affidavits of Gordon and Stanley. The cross-motion, filed for repayment of an excessive retainer under 11 U.S.C. § 329(b), sought to recover for the Debtors the amount by which the $200,000 retainer exceeded WS&G's post-petition services. WS&G opposed the Debtors' cross-motion on the basis that it was procedurally improper.

23. The Debtors also began to contemplate filing an action against WS&G under 11 U.S.C. § 547(b), for the recovery of a preference.

24. In the meantime, WS&G had filed three additional interim fee applications covering the period June 1983 through December 1983. All WS&G interim fee applications and the Court's actions thereon are summarized below:

| Application | Period Covered | Date Filed | Requested Fee & Exp. | Court Allowance |
|---|---|---|---|---|
| First (Amended) | 1/14–5/31/83 | 6/22/83 | $130,926.47 | $111,983.27* |
| Second | 6/1–7/31/83 | 8/29/83 | 4,543.52 | 9,209.40 |
| Third | 8/1–9/30/83 | 11/8/83 | 7,006.68 | |
| Fourth | 10/1–12/31/83 | 2/22/84 | 6,902.71 | 6,287.36 |

* Inclusive of $64,450.30 retainer.

25. A total of $127,480.03 in interim fee and expense allowances, including the amount of $64,450.30 asserted by WS&G to be its retainer, has been authorized by this Court to WS&G to date.

26. Through February 28, 1984, WS&G has incurred legal fees and reimbursable expenses in connection with these proceedings in the total amount of $153,263.85. WS&G expects to incur further legal fees and reimbursable expenses in connection with these proceedings on account of, *inter alia*, the preparation, filing and hearing of a final application for fees and expenses covering all legal fees and expenses incurred by the Debtors in connection with these proceedings. Other than the work regarding a final fee application, WS&G has substantially completed its authorized representation of the Debtors.

27. Between January 31, 1984 and February 6, 1984, Debtors' counsel and WS&G engaged in settlement discussions concerning this dispute. Rather than engage in a potentially lengthy lawsuit, WS&G and the Debtors propose a compromise of the controversy. They stipulated to a settlement of "all disputes between them in respect to

the amount of the retainer paid to WS&G by GHR as well as any alleged preference to WS&G."

28. The Stipulation provided, *inter alia,* with respect to the $200,000 payment, that the retainer paid to WS&G in connection with these proceedings would be deemed to be $88,216.79, representing an increase of $23,766.49 over and above the amount which WS&G had asserted was the retainer. That increase reduced by 50% the amount due to be paid WS&G by the Debtors under the bankruptcy court's first order authorizing an interim allowance. The Debtors agreed promptly to pay the remaining $23,766.49 and agreed to pay the $9,209.40 interim allowance authorized by the court on January 12, 1984. As a consequence of this increase in the retainer, the parties acknowledged a *pro tanto* increase in WS&G's pre-petition claim by the like amount of $23,766.49. The increase reflects the consequence that if an additional $23,766.49 of the January 14, 1983 $200,000 payment is applied as a retainer, then a like amount could not have been applied against outstanding WS&G bills and, therefore, those bills remain outstanding.

29. The Stipulation further provided for the waiver by the Debtors of any preference claims against WS&G, and the waiver by WS&G of claims for interest, costs and sanctions associated with GHR's delay in paying WS&G the interim fees allowed by the Court.

30. Hearing on the proposed settlement and stipulation was held on February 22, 1984, at which time Continental Illinois National Bank and Trust Company of Chicago ("the Banks"), having raised no previous objection to WS&G's Motion to Compel Payment of Interim Fees, filed an objection in open court to the proposed stipulation. The grounds of that objection were, *inter alia,* 1) that the pleadings filed did not support the conclusion that $23,766.49 was adequate consideration for the Debtors' agreement to forgo all preference claims against WS&G, 2) that the stipulation was not in the best interest of the Debtors'

estates and 3) that adequate information was not available from which Continental could determine whether there existed factual support for the finding that the proposed stipulation was in the best interests of the Debtors' estates.

31. On May 16, 1984, this Court entered an order approving the stipulation and finding it to be fair, reasonable and in the best interests of the Debtors' estates. The order did not contain an explanation of the reasons for the findings; therefore, despite the fact that the Banks never requested reconsideration of the order nor the issuance of detailed findings of fact and conclusions of law, the Banks filed an appeal from the order.

32. Judge Freedman of the United States District Court, upon hearing the appeal, ruled that there were no findings of fact and no analysis in the bankruptcy court's approval of the compromise which could be reviewed. Ordinarily, the abuse of discretion standard of review would have been applied to the lower court's approval of the compromise. In this case, however, the record was found to be inadequate for the purpose of appellate review so the matter was remanded to the bankruptcy court for further development of the record and for a statement of reasons for approval of the compromise. A hearing, in keeping with that order, was held in Worcester's bankruptcy court on April 26, 1985.

33. During the time period October, 1975 through January, 1983, prior to the filing of the Debtors' Chapter 11 Petitions, WS&G performed legal services and incurred reimbursable expenses on behalf of the Debtors, their affiliated corporations and related entities. During the period of October 15, through May 13, 1983, and exclusive of work done in preparation for or during these Chapter 11 proceedings, bills were rendered to these Debtors, their affiliated corporations and related entities by WS&G, on a regular monthly basis utilizing its regular hourly rates, as follows:

| For services rendered and reimbursable expenses incurred during the month of: | Amount of bills | Dates of bills |
|---|---|---|
| September, 1982 | $49,631.84 | October 15, 1982 |
| October, 1982 | 49,553.30 | November 15, 1982 |
| November, 1982 | 89,761.92 | December 15, 1982 |
| December, 1982 | 45,787.78 | January 14, 1983 |
| January, 1983 | 37,928.45 | May 13, 1983 |

34. From November 24, 1982 through January 26, 1983, WS&G received and applied the following payments on behalf of the Debtors, their affiliated corporations and related entities:

(a) $100,000 on November 24, 1982 was applied to bills dated August 18, 1981 through September 15, 1982.

(b) $36,000 on December 13, 1982 was applied to bills dated January 15, 1982 through November 15, 1982.

(c) $64,000 on December 30, 1982 was applied to bills dated August 24, 1981 through November 15, 1982.

(d) $200,000 on January 14, 1983 was applied $45,787.78 to bills dated January 14, 1983 representing work performed and reimbursable expenses incurred during the month of December, 1982; $89,761.92 to bills dated December 15, 1983 representing work performed and reimbursable expenses incurred during the month of November, 1982; and $64,450.30 as a retainer for "... the new matter".

No other payments were received by WS&G from or on behalf of the Debtors within the 90 days prior to the January 26, 1983 filing of the first of the Debtors' Petitions.

35. After application of all payments received by the Debtors, their affiliated corporations and related entities prior to these Chapter 11 proceedings, WS&G asserts a remaining balance due from the Debtors of $280,189.38 as set forth in proofs of claim WS&G has filed in each of the Debtors' Chapter 11 proceedings. Of that sum, $41,046.00 represents services rendered during the month of September, 1982, $39,798.50 represents services rendered during the month of October, 1982, and $37,928.45 represents services rendered during the month of January, 1983. WS&G has also filed an administrative expense priority claim in the amount of $54,812.59 in the Good Hope Industries, Inc. bankruptcy proceeding.

36. Beginning on January 14, 1983, attorneys at WS&G began billing some of their time and reimbursable expenses to the "new matter" file referred to in the retainer bill dated January 14, 1983.

37. On November 14, 1983, WS&G filed in these Chapter 11 proceedings its Statement of Attorney, therein setting forth that WS&G had received the sum of $64,450.30 as "compensation paid for services rendered or to be rendered ..." in connection with the Debtors' Chapter 11 proceedings.

38. A total of $127,480.03 in interim fee and expense allowances, including the amount of $64,450.30 asserted by WS&G to be its retainer, has been authorized by this Court to WS&G to date.

39. Through February 28, 1984, WS&G has incurred legal fees and reimbursable expenses in connection with these proceedings in the total amount of $153,263.85. WS&G expects to incur further legal fees and reimbursable expenses in connection with these proceedings on account of, *inter alia*, the preparation, filing and hearing of a final application for fees and expenses covering all legal fees and expenses incurred by the Debtors in connection with these proceedings. Other than the work regarding a final fee application, WS&G has substantially completed its authorized representation of the Debtors.

## DISCUSSION

It is important to emphasize that the April 26, 1985 bankruptcy court hearing was held for the purpose of developing the record with respect to the settlement, and not for determining the underlying issues themselves. Although the approval of a compromise is within the discretion of the court, *In re Hallet,* 33 B.R. 564 (Bankr. D.Me.1983), the court must do more than give "mere boilerplate approval." *In the Matter of Boston & Providence Railroad Corp.,* 673 F.2d 11, 12 (1st Cir.1982). It must assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. *Id.* Such a balancing of benefits is had from the receipt of evidence and is not based merely on conclusory statements made by counsel supporting the compromise. *Id.* While it is not necessary "that, in order to avoid a trial, the judge must in effect conduct one," *Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1983), the court should include the following in its analysis of a compromise: "the probability of success of the litigation, the difficulties of discovery, the complexity, expense and delay incurred by litigation, and the paramount interest of the creditors." *In re Continental Investment Corp.,* 637 F.2d 8, 11 (1st Cir.1980). The burden of persuading the court that the compromise should be approved rests with the parties proposing the compromise. *In re Hallet, supra; In re W.T. Grant Company,* 4 B.R. 53, 80 (Bankr.S.D.N.Y.1980).

Substantial evidence exists that supports the assertion that the full $200,000 payment was to be a retainer. Despite the absence of a definitive statement or written instruction as to the nature of the payment, the facts stack up as follows. WS&G generally requests a retainer when undertaking representation of a debtor about to enter Chapter 11. Mr. Stanley understood the request to be for a retainer and Attorney Gordon also understood the payment to be a retainer. The description on the $200,000 check of "Legal Fees on Account" could very well have meant on account of the petitions being filed and not on account of past services rendered.

If the $200,000 payment were a retainer, the Debtors may have a claim under § 329(b) in the amount of $47,537.97, the $200,000 retainer minus the fees of $128,766 and the expenses of $24,497.85 incurred in these proceedings thus far by WS&G. There is no indication in either § 329(b) or the cases decided thereunder that the Debtor must wait until the termination of its proceedings to recover excessive fees under § 329(b), but neither is there legal precedent to recover an allegedly excessive retainer before the final fees of that attorney have been decided. Litigation of the retainer dispute would likely be delayed until the conclusion of the Chapter 11 proceedings, after the accumulation of more WS&G fees, with the greater the dividend in the Chapter 11 proceedings making the $47,500 recovery on the excessive retainer dispute less meaningful.

In addition to the evidence on the retainer dispute, evidence was presented as to the value of the preference claims. Detailed evidence was presented of the payments made by the Debtors to WS&G within the six months prior to the Debtors' 1983 petition filings. In most preference motions that is the period which would be scrutinized by the court unless the defendant's classification as an insider expands that period to cover the entire year prior to the petition filing. In this case, the Court views the likelihood of WS&G's being classified as an insider as weak. It is for that reason that the Court does not deem Attorney Gordon's lack of a reasonable estimate of the payments made during the first six months of 1982 to be a significant gap in the evidence of the value of the claims given up by the Debtor. Attorneys Gordon and Wise may have been assistant secretaries to the Debtors, but theirs were merely positions of ministerial responsibilities which included such tasks as signing certificates attesting to the existence of the corporate vote. Such ministerial tasks are not likely to cause Attorneys Gordon and Wise to rise to the level of insiders in the same

way that managerial tasks place corporate operating officers clearly on that level.

Even if attorneys Gordon and Wise were considered insiders by the virtue of their close relationship with the Debtors, no preference actions have been brought or would be worth bringing because of the complete defense of solvency. Attorney Gordon believes that during 1982 the Debtors' assets significantly outweighed their liabilities. Although he is not an expert on asset valuation, his opinion testimony is evidence of the Debtors' position on an issue which is very relevant to the settlement. Obviously, if the Debtors view themselves as solvent, the value of any preference action is significantly decreased if not nullified totally. The burden would be on the Debtors to prove solvency, a task which would cost a considerable amount of time and money and be monumental in scope. When talking about Debtors in the plural, whose geographically scattered assets approximate one billion dollars, one is talking about the testimony of a variety of experts, extensive time, and a great deal of expense to the estate, not to mention the added problem of determining just whose funds were paid to WS&G. Some or all of the funds transferred to WS&G on January 14, 1983 represented funds not of the Debtor entities, but rather funds of non-debtor entities. In order to recover a preference, there must have been a transfer of property of the Debtor. To resolve the issue of the source of funds, even more time and more money would need to be expended beyond the time to prove solvency.

In addition to the defense of solvency and the difficulty of determining the source of the funds received by WS&G there are several other defenses to the preference actions. One is based upon the fact that WS&G received no more by the transfer than it would were there a Chapter 7 distribution. This defense is tied to the solvency issue and is based upon the belief that if liquidated, all creditors would receive 100 percent of their claims plus interest, a payoff under which there can be no preference.

Wholly apart from the solvency issue is the issue, never addressed by the court, of when a debt to a law firm who performs legal services on a daily basis for a client is incurred. It is a difficult question which undoubtedly would be appealed by either side if decided against them.

WS&G gave up approximately $23,000 that had been awarded in interim fees, interest on those interim fee payments that were not made, sanctions against the Debtors and the costs of having to bring the action. The Debtors have given up a possible $47,500 excessive retainer suit and preference actions which would likely not yield a recovery. Aside from the solvency question which would probably exceed $100,000 to litigate, the other issues would probably cost each of the parties anywhere between $25,000 and $75,000 to litigate, prove, complete discovery, and deal with appeals on legal issues that might be filed. All monies given up by WS&G and the Debtors seem insignificant in the face of the potential cost to each in recovering these monies.

## ORDER

This Court has apprised itself of sufficient facts to determine whether the proposed settlement is in the best interest of the estates and their creditors. *See In re Continental Investment Corp., supra; In the Matter of Boston & Providence Railroad Corp., supra.* After consideration of the probability of success of the litigation, the difficulties of discovery, the complexity, expense and delay that would be caused by the litigation, and the interest of the creditors in light of the anticipated 100 cent return on the dollar contemplated by the reorganization plan, this Court allows the motion to approve the proposed settlement.