## In re FINANCIAL NEWS NETWORK INC., Debtor.

### CONSUMER NEWS AND BUSINESS CHANNEL PARTNERSHIP, Appellant,

v.

### FINANCIAL NEWS NETWORK INC., Official Committee of Unsecured Creditors of Financial News Network Inc. and Security Pacific National Bank, Appellees.

No. 91 Civ. 4710(MEL).

Bankruptcy No. 91 B 10891(FGC).

United States District Court, S.D. New York.

Dec. 26, 1991.

Weil, Gotshal & Manges, New York City (Bruce R. Zirinsky, Deborah Deitsch–Perez, Banks Tarver, Roger F. Assad, of counsel), for appellant.

Gibson, Dunn & Crutcher, New York City (Ronald S. Orr, Robert B. Krakow, Michael A. Rosenthal, Randy M. Mastro, of counsel), for Financial News Network Inc.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Geoffrey M. Kalmus, Kenneth H. Eckstein, of counsel), for the Official Committee of Unsecured Creditors of Financial News Network Inc.

O'Melveny & Myers, Los Angeles, Cal. (Ben H. Logan, of counsel), for Sec. Pacific Nat. Bank.

---

LASKER, District Judge.

Consumer News and Business Channel Partnership ("CNBC") appeals from a ruling of the United States bankruptcy court for the Southern District of New York, Conrad, *Judge*,[1] concerning the conduct of an auction disposing of assets of Financial News Network, Inc. ("FNN"), which was operating with Chapter 11 bankruptcy protection.

The decision of the bankruptcy court is affirmed.

\*      \*      \*      \*      \*      \*

This appeal concerns the difficult balance bankruptcy courts must strike between the need for orderly judicial sales and the need for flexibility to respond to the unique circumstances of each case and to maximize return to the estate. That issue arises frequently and, indeed, has arisen earlier in this case. *See In re Financial News Network Inc.*, 126 B.R. 152 (S.D.N.Y.1991).

At issue is the bankruptcy court's decision to receive in evidence, following the apparent close of an auction for FNN's assets, information of a hard cash offer by an investment bank for a contingent future revenue stream which formed a component of Dow Jones/Group W's ("Dow") bid, and the value of which was the principal contested question in determining the relative value of the two competing bids. In response to the receipt of the additional evidence, CNBC increased its bid and was awarded FNN's assets. On appeal CNBC argues that the bankruptcy court erred in considering the investment bank's offer and in reopening the bidding, and that accordingly CNBC should be required to pay only the amount of its previous offer to the estate, rather than the full amount of its enhanced bid.

## I.

In accord with this court's earlier instructions to the bankruptcy court to evaluate bids both from Dow and CNBC, the bank-

ruptcy court scheduled an open-bid auction for May 7, 1991.

At that proceeding, Dow placed a bid it valued at $167.1 million, which included $125 million in cash, a share of future FNN revenues which it valued at $32.8 million, and assumed liabilities which it valued at $9.3 million.

CNBC bid $135 million in cash, with no noncash component. CNBC sought but did not receive an immediate judgment that its bid was the "highest and best" one presented. CNBC then repeatedly asked the court to indicate its valuation of the non-cash component of Dow's bid so that CNBC could "know what we are bidding against right now," May 7 Tr. at 21, and so that "both parties [have] an opportunity to see what the other person is bidding and make an informed decision as to whether or not to match or beat that offer." *Id.* at 26. Judge Conrad responded that he believed he had sufficient information to place a value on Dow's bid, and that CNBC would have to bid according to its own estimate of the Dow bid. *Id.* at 28.

Following its failure to secure an indication from the court of its valuation of Dow's bid, CNBC increased its bid to $140 million in cash as well as an assumption of liabilities valued at $6.1 million. *Id.* at 34.

Judge Conrad stated, "Bidding is closed," *id.* at 38, and prepared to receive testimony as to valuation of noncash components of the bids.

Following a lunch recess, CNBC "clarif[ied]" its bid by offering to assume liabilities valued at $3.2 million beyond those assumed in its original bid, and by offering to waive its right of appeal from an earlier ruling if it received the bid. *Id.* at 43–44. Dow expressed its view that the additional assumption of liabilities represented a "modification" rather than a "clarification" of CNBC's bid. *Id.*

The hearing proceeded with testimony concerning the value of the bids. The main contested issue was the value of the share

---

1. Hon. Francis G. Conrad, United States Bankruptcy Judge for the District of Vermont, sitting

by designation.

of future revenues promised in Dow's bid, which Dow claimed to be worth $32.8 million, of which it guaranteed revenue with a present value of $7.6 million. CNBC argued that the future revenue would never be realized and should not be factored into the bid beyond the guaranteed amount. Under CNBC's analysis, its bid totalled $149.3 million, while Dow's totalled $141.9 million. However, if Dow's valuation were accepted its bid could have been deemed to be worth considerably more.[2]

At the May 7 hearing, FNN expressed its belief that in "a very close call" the Dow bid was superior to CNBC's. *Id.* at 178–179. The creditors' committee stated its preference for the CNBC bid. *Id.* at 183. Other interested parties split between the two bids. *Id.* at 187, 188, 189.

Following the parties' indications of preference between the two bids, the court stated, "The hearing is concluded." *Id.* at 190.

The following morning (May 8), FNN asked the bankruptcy court to delay its ruling in order to consider information which it said was newly available. FNN informed the court that it had learned that morning that the investment bank Dillon Read (which had been working with Dow in connection with the FNN asset sale) had offered to purchase much of the Dow bid's unguaranteed revenue stream for $17 million at the closing of a sale to Dow. Dillon Read's offer, if taken into consideration, would eliminate the uncertainty concerning the present value of the unguaranteed portion of Dow's offer, and would fix the present value of the Dow bid at $158.9 million. That amount was $9.6 million greater than the CNBC bid, which was enough to offset the breakup fee that would have been awarded to CNBC in the event of a sale to Dow.

Later on May 8, the bankruptcy court conducted a conference call among the parties to determine whether to consider the Dillon Read offer as evidence of the bids' relative value. CNBC objected "extremely,

extremely vigorously" to what it viewed as an effort to present a new Dow bid after the close of bidding and the completion of the record by which the bids were to be evaluated. May 8 Tr. at 4, 11. FNN stated that the Dillon Read offer was an unsolicited offer by a third party to the estate for a portion of Dow's bid which was, in its view, probative of the value of the Dow bid, rather than a new or revised bid by Dow. *Id.* at 5–6. Dow stated its agreement with FNN's position. *Id.* at 14.

Judge Conrad then stated that he would "take the evidence of this as additional probative evidence.... [T]his is certainly probative of the value of the contingent revenue stream." *Id.* at 13. However, the court stated its belief that "it's a change in [Dow's] bid," and therefore reopened the bidding to allow both CNBC and Dow to offer revised bids. *Id.* at 13–14.

Following this ruling, Dow urged the court to reconsider its decision to reopen the bidding, arguing that bidding had closed as of noon on May 7 and that the Dillon Read offer was simply new evidence of the value of bids submitted at that time, and was not a new offer requiring or even justifying reopening of bidding. Judge Conrad replied, "I guess I disagree with you all. This makes what was the contingent payment very much guaranteed." *Id.* at 16.

As to whether the Dillon Read offer was a clandestine attempt by Dow to bolster its offer after the close of bidding, which CNBC claimed but FNN and Dow denied, Judge Conrad stated, "[S]omeone suggested they had this as a runaround, but I would not like to suggest that. Dillon was their agent, and maybe the idea was put in the [sic] minds yesterday by Mr. Eckstein's questioning about selling this, and maybe they looked at it as an opportunity. But in point of fact, it does change the bid." *Id.* at 17–18. CNBC mischaracterizes the court's findings in its brief, claiming that the court found the Dillon Read offer to be in reality a revised bid by Dow. In fact, as

---

**2.** Comparison between the two bids also took into account a substantial "breakup fee" which, under a previous agreement between FNN and

CNBC, CNBC would receive if another bidder prevailed.

indicated by the quoted transcript passage, Judge Conrad did not make such a finding, but did recognize that the new evidence fundamentally altered the *nature* of Dow's bid. Accordingly, a teleconference was scheduled for 9:00 A.M. May 9 to receive revised bids.

At the May 9 proceeding, CNBC urged the court to reconsider its decision to consider the Dillon Read bid and to reopen the bidding, while FNN argued that bidding should not be reopened although the Dillon Read offer should be received as evidence of the Dow bid's value. It is noteworthy that despite the presence of a representative from Dillon Read and the fact that on May 8 CNBC had raised the possibility of questioning that person on the subject of Dillon Read's possible collaboration with Dow, CNBC did not request that such an inquiry be undertaken on May 9.

In response to the comments of the parties during the May 9 teleconference, Judge Conrad stated that the Dillon Read offer was highly probative of the value of Dow's bid and that in fact it effectively changed the bid by fixing the value of an extremely uncertain contingent revenue stream. *Id.* at 12–13. He went on to observe, "On the other hand, I think CNBC got bushwacked [sic] here.... They had an offer, they had very little time to evaluate the offer.... They heard the evidence that was presented before them.... CNBC relied upon the evidence...." *Id.* at 13–14. Accordingly, Judge Conrad denied the motion to reconsider his previous ruling, admitted the Dillon Read offer as evidence as to the Dow bid's value, and further allowed both CNBC and Dow to offer one final revised bid in light of the Dillon Read offer.

Accordingly, CNBC then made a revised bid of $145 million (its previous bid was $140 million) and a share of advertising revenues above a certain plateau, although expressly preserving its objection to the renewal of bidding. *Id.* at 19–20. Dow declined to revise its bid, and the bidding was closed. *Id.* at 25. Following a brief discussion of certain procedural questions, the court orally ruled that CNBC's was the

prevailing bid. *Id.* at 30. The ruling was memorialized in a Memorandum of Decision ("Mem. Dec.") dated May 10, 1991, 1991 WL 127524.

## II.

### A. The Decision to Receive Additional Bids

To prevail on its appeal of the award of FNN's assets, CNBC must establish that the bankruptcy court abused its discretion in considering the Dillon Read proposal and in allowing the submission of revised bids. *See In re Chung King, Inc.,* 753 F.2d 547, 549 (7th Cir.1985); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir.1983).

CNBC's chief argument on appeal is that the bankruptcy court erroneously "permitted Dow/Group W, the losing bidder, to submit a new bid which unfairly and improperly forced CNBC to raise its bid in order to maintain its position as the highest and best bidder." CNBC Brief at 21. In support of its position, CNBC relies on case law which protects the integrity and finality of judicial sales by holding that "it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed." *In re Gil–Bern Industries, Inc.,* 526 F.2d 627, 629 (1st Cir.1975); *see also In re Stanley Engineering Corp.,* 164 F.2d 316 (3d Cir.1947); *In re Fullwood Enterprises, Inc.,* 105 B.R. 707 (Bankr.M.D.Fla. 1989). The policy underlying these rulings is that "it is important that the bidder receive what he has reason to expect, and that nothing impair public confidence in the regularity of judicial sales." *Gil–Bern,* 526 F.2d at 628. CNBC maintains that departure from this rule has been approved only when the initially-prevailing bid is grossly disproportionate to the asset's market value or when the disparity between the initial bid and the intervening bid is so great as to shock the conscience of the court. *See In re Chung King, Inc.,* 753 F.2d 547, 550 (7th Cir.1985) (8.6% difference in initial highest bid and later bid insufficient to render initial bid "grossly inadequate").

CNBC's reading of this line of cases is correct, but its application of them to the instant case is not. The decisions it cites all involved asset sales with bidding deadlines in which the rival bids were both simple cash bids. All the cases it relies upon held that it was error for a bankruptcy court to permit the lower bid to be increased following the close of bidding, and that allowing the previous high bidder to increase its bid did not cure the error. *See, e.g., Gil–Bern,* 526 F.2d at 628, 629.

In the case at hand, however, there was no clearly prevailing party at the close of bidding,[3] and neither Dow nor CNBC sought to revise its bid. Instead, a third party (Dillon Read) came forward with a hard cash offer to the estate for the portion of Dow's bid the value of which was the central subject of dispute before the court. Dillon Read's offer unquestionably was probative of the value of Dow's bid. Indeed, as all parties and the court recognized, it changed the entire complexion of Dow's bid: the bid was transformed from one that provided a smaller certain return but greater potential return than CNBC's to one that provided both a greater guaranteed return and a greater "up side."

CNBC's appeal is premised on its characterization of the Dillon Read offer as a new offer by Dow after the close of bidding. However, CNBC did not present evidence or request a ruling and the bankruptcy court did not determine whether or not Dillon Read acted in conjunction with Dow or on its own. The court instead stated, "All this is speculation on our part, however. We have to deal in facts, and the fact is that Dillon was willing to pay 'hard cash' for FNN's future income stream." Mem. Dec. at 10. *See also* May 8 Tr. at 17–18. Accordingly, the court viewed the Dillon Read offer essentially as new evidence which warranted reopening the record of the hearing to evaluate the two bids, albeit as evidence that changed the character of Dow's bid. *See* Mem.Op. at 6 ("After we granted FNN's motion, we noted that it constituted a change in Dow's bid …").

In the circumstances, it would not have been error for the bankruptcy court to consider the Dillon Read statement as new evidence and to have refused to allow modifications to either bid.[4] Here the two contending bids were structured differently and accordingly were difficult to compare. The May 7 hearing had been aimed primarily at determining the value of Dow's bid, which was uncertain because of its contingent revenue component. *See* Mem. Dec. at 4 ("The evidence submitted on May 7 about the unguaranteed revenue sharing provision was at best equivocal"). Dillon Read's offer simply was newly available evidence obtained from a third party which

---

**3.** CNBC claims vociferously that its May 7 bid was plainly superior to Dow's, but it has supplied no convincing basis for that assertion. The fact that interested parties stated different preferences on the record on May 7, the fact that CNBC enhanced its bid after a lunch recess following the close of bidding, and the fact that the court viewed the prospect of evaluating the bids as "a yeoman's task," Mem. Dec. at 4, all indicate that there was no clear winner after the May 7 proceeding.

CNBC points to statements by Judge Conrad on May 9 and in his decision of May 10 indicating his belief that the initial CNBC bid was superior to the initial Dow bid, but those statements were made two days after the initial bids and hearing and one day after the Dillon Read offer was made known, and accordingly were not available to shape the parties' impression of who the apparent winner was on the evening of May 7. The Judge's comments on May 9 indicate his belief that it was clear to everyone at the May 7 hearing that the nonguaranteed portion of Dow's bid was worth "less" than Dow

claimed, but not that Dow's bid as a whole was worth less than CNBC's. Moreover, although Judge Conrad's comments express his view that the Dow's bid was "soft" and that Dow "no doubt" believed CNBC's bid to be superior, the judge went on to identify his observations as "speculation," *see* Mem. Dec. at 10, and based his decision on the "hard" evidence presented by Dillon Read's bid. Nowhere is there a factual determination by Judge Conrad that there was an obvious prevailing party at the end of May 7.

**4.** While the investment bank/client relationship between Dillon Read and Dow may give rise to suspicions of their cooperation, there is no evidence in the record to support such an inference, and, aside from conclusory observations of CNBC's counsel, there was no attempt made to investigate the possibility. In those circumstances we decline to infer cooperation where the Bankruptcy Judge, who had an immediate feel for the situation, made no such finding.

gave a clear answer to what at the close of the May 7 hearing appeared to be a vexing problem for the court, and was properly admitted.

The question then becomes the propriety of the court's decision to reopen bidding in light of the new evidence. Several factors militated in favor of reopening the bidding. The evidence drastically altered the nature of the Dow bid to which CNBC had carefully tailored its response, so that CNBC would have been prejudiced by consideration of the Dillon Read offer without provision for revised bids. Moreover, the existence of some ambiguity as to the relationship of Dillon Read with Dow called into question the equity of simply receiving the evidence without offering CNBC a chance to respond, even if the evidence came from a formally independent source rather than from Dow. In addition, because there had been no final award and the results of the hearing remained substantially in doubt at the time the evidence was received (as it was despite CNBC's impassioned opposition) there was no firm repose to be disturbed by reopening the bidding. Finally, and importantly, the earlier proceeding had seen considerable "ebb and flow," *see* Mem. Dec. at 2, with CNBC revising its bid on the afternoon of May 7 even though bidding had been declared closed by the court, which suggests that both parties understood that the proceeding was not constrained by rigid procedural requirements.

On the other hand, the bidding and hearing on offers received had been declared closed, so that reopening the bidding can be argued to have run counter to the policy favoring regularity of judicial sales of debtors' assets and repose at the conclusion of such proceedings. *See, e.g., Gil–Bern*, 526 F.2d at 628. The purpose of that important policy is "to insure reliance upon such sales, and induce biddings," *Pewabic Mining Co. v. Mason*, 145 U.S. 349, 356, 12 S.Ct. 887, 888, 36 L.Ed. 732 (1892), without which the effectiveness of judicial sales would be undermined.

For all the reasons discussed above, the balance struck by the bankruptcy court cannot be deemed an abuse of discretion. The Dillon Read offer was probative, indeed dispositive, of the most difficult question facing the court at the close of the May 7 hearing, and accordingly merited consideration despite its late availability.[5] The most sensible response to unforeseen evidence which fundamentally altered the character of one bid was to allow each side to revise its bid in light of that evidence.

The result is not inconsistent with the need for regularity in bankruptcy court proceedings or for repose following a judicial sale of assets. Ensuring regularity protects parties' ability to rely on consistent and fair rules of the game, both to insure fairness to the immediate parties and to preserve the long-term viability of judicial sales. *See, e.g., Pewabic Mining Co.,* 145 U.S. at 356, 12 S.Ct. at 888. Here the court consciously and openly adopted an unconstrained method of auction from the beginning. Both CNBC and Dow knew that was the case at the time they entered the bidding for FNN's assets, and, indeed, CNBC earlier was permitted to revise its position after bidding had been declared closed. Accordingly, the decision to reopen bidding in light of late evidence that transformed the character of one bid is not inconsistent with the rules by which this auction was conducted or with any reasonable expectations that the bidding parties or the estate may have had.

Moreover, although the need for repose following judicial sales is unquestionably significant, here at the time the Dillon Read offer was received and each party was afforded one more opportunity to bid in light of that offer, there was no announced prevailing bid, and no readily apparent superior bid. Thus the "repose" that was disrupted by a resumption in bidding was tenuous at best.

In addition to being an equitable response to the immediate situation, reopening the bidding here did no great harm to

---

**5.** Our approval of the Court's receipt of the evidence does not mean that a refusal to reopen the record necessarily would have been unwarranted; the question is best left to the Bankruptcy Court's discretion in light of its superior feel for the nuances of the particular proceeding.

the long-term viability of judicial asset sales, the other concern of the policy favoring repose. The situation was highly unusual and appears unlikely to recur frequently. In the event similar circumstances arise, bankruptcy courts retain considerable discretion to prevent manipulation or undermining of their sale procedures, an authority which the approach taken in this case has not diminished.

### B. Judicial Estoppel

FNN and the unsecured creditors' committee, in opposition to CNBC's appeal, argue in the alternative that even if the court did abuse its discretion in reopening bidding, CNBC is barred by the doctrine of judicial estoppel from asserting this objection. Judicial estoppel bars the intentional assertion of inconsistent positions by one party in the same proceeding. *See, e.g., Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598–99 (6th Cir.1982). The judicial estoppel argument arises because CNBC sought and received permission to revise its bid after a recess following the close of bidding on May 7.

In the circumstances of this case the argument for judicial estoppel is not persuasive. The rapidly changing circumstances of the asset award proceeding render it unjustified to hold that CNBC intentionally asserted inconsistent positions "in order to mislead the court and obtain unfair advantage as against another party". *See United States v. Starrett City Associates,* 605 F.Supp. 262, 264 (E.D.N.Y.1985).

\*      \*      \*      \*      \*      \*

For the reasons discussed above, the award of assets to CNBC on the terms stated by the bankruptcy court is affirmed.

It is so ordered.