**In re FINANCIAL NEWS NETWORK INC., Debtor.**

**CONSUMER NEWS AND BUSINESS CHANNEL PARTNERSHIP, Appellant,**

v.

**FINANCIAL NEWS NETWORK INC.; Official Committee of Unsecured Creditors of Financial News Network, Incorporated; Security Pacific National Bank, Appellee.**

**No. 1546, Docket 92–5011.**

United States Court of Appeals, Second Circuit.

Argued May 11, 1992.

Decided Nov. 25, 1992.

Richard Cotton, New York City (Ellen Miller–Wachtel, Maria Barton, National Broadcasting Co., Inc., Bruce R. Zirinsky, Steven Alan Reiss, Deborah Deitsch–Perez, Banks Tarver, Roger F: Assad, Weil, Gotshal & Manges, of counsel), for appellant CNBC, Inc.

Robert B. Krakow, New York City, Ronald S. Orr, Gibson, Dunn & Crutcher, for Financial News Network Inc.; Geoffrey M. Kalmus, Kenneth H. Eckstein, Kramer, Levin, Nessen, Kamin & Frankel, for Official Committee of Unsecured Creditors of Financial News Network Inc. (of counsel), for appellees.

Before: FEINBERG and CARDAMONE, Circuit Judges, and LARIMER, District Judge.[*]

CARDAMONE, Circuit Judge:

This appeal concerns the difficult balancing act a bankruptcy court must perform when it conducts an auction of a debtor's assets. It walks a tightrope between, on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

Consumer News and Business Channel Partnership (CNBC, Consumer News or appellant) appeals from a December 30, 1991 order of the United States District Court for the Southern District of New York (Lasker, J.) affirming the May 10, 1991 order of the Southern District Bankruptcy Court (Conrad, J.). CNBC purchased the media assets of the debtor, Financial News Network, Inc. (Financial News or debtor), after an auction in the bankruptcy court at which CNBC and Dow Jones/Group W Television Company were the only bidders.

Consumer News now contends that the bankruptcy court abused its discretion in considering evidence, following the apparent close of bidding, of a cash offer by Dillon Read & Co., Inc.—Dow Jones/Group W's investment bank—to purchase a portion of the debtor's contingent future revenue stream, which formed a component of Dow Jones/Group W's bid. Appellant believes that the bankruptcy court's consideration of this late offer was improper and that it forced appellant to increase its prior bid by $5 million. CNBC urges on appeal that as a result, it should be liable to pay only the amount it previously offered for the media assets of Financial News, rather than the full amount of its enhanced bid.

[*] Hon. David G. Larimer, United States District Judge for the Western District of New York, sitting by designation.

BACKGROUND

We examine first the facts that led to the auction in bankruptcy court and then the circumstances of that sale. Financial News, a cable television programming service specializing in financial and business news, began soliciting purchasers in November 1990 for its media assets. Anticipating filing a Chapter 11 bankruptcy petition and realizing that the corporation's business and asset values would deteriorate rapidly during bankruptcy, it attempted to dispose of its assets through a private sale. On February 11, 1991 it reached an agreement in principle with Dow Jones/Group W for the latter to purchase its media assets for $90 million, subject to the terms of a definitive agreement, which the parties then undertook to negotiate.

Two weeks later on February 25—while these negotiations were underway—Consumer News submitted a higher bid to purchase these same assets for $105 million. The offer contained two conditions: (1) Financial News had to keep the offer secret prior to accepting or rejecting it, and (2) it had to decide by 11:00 p.m. that same day. The offer also included a provision for payment of a "breakup fee" to Consumer News if Financial News did not accept the bid. Financial News' board of directors approved the offer and authorized the execution of an agreement to sell its assets to Consumer News.

In accordance with the executed agreement, Financial News filed a chapter 11 petition within a week and sought expedited approval of the purchase agreement. Dow Jones/Group W objected to the proposed sale, and moved before the bankruptcy court for an opportunity to submit its own bid for the debtor's media assets. The bankruptcy court granted the motion and gave Dow Jones/Group W until March 25 to submit a written competing bid that was to conform to the terms of Consumer News' outstanding offer in all particulars except price. In the event of further competition, an auction sale was ordered for

April 3. Dow Jones/Group W thereafter submitted a written bid that it valued at $115 million.

At the April 3 auction, Dow Jones/Group W, unlike Consumer News, refused to keep its offer open until May 31 regardless of which bid was successful. For that reason, the bankruptcy court refused to consider Dow Jones/Group W's bid, and instead awarded the assets to CNBC for $105 million. CNBC then voluntarily raised its bid price to $115 million to equal that of Dow Jones/Group W. The latter appealed the bankruptcy court decision selling the debtor's media assets to appellant. The district court, focusing on the importance of achieving maximum benefit for the bankrupt estate and warning against overly strict adherence to bidding rules, reversed and remanded for a new auction. *See In re Financial News Network, Inc.*, 126 B.R. 152 (S.D.N.Y.1991).

At the new auction held on May 7, 1991 Dow Jones/Group W bid $167.1 million, comprised as follows: (1) $125 million in cash; (2) $9.3 million in assumed liabilities; (3) $7.6 million representing the present value of a guaranteed share of the future revenues of Financial News; and (4) $25.2 million representing the alleged present value of an unguaranteed share of the debtor's future revenues (contingent future revenues). Consumer News objected to this bid because the assumed liability and "soft money" contingent future revenues components did not comply with the bankruptcy court's requirement of conforming bids. At the same time it submitted its own bid for $135 million in cash, and asked the bankruptcy court to rule on the value of the assumed liabilities and "soft money" components of the Dow Jones/Group W bid. The court declined to so rule. Appellant then revised its bid upward to $140 million in cash, plus an assumption of up to $6.1 million of the debtor's liabilities. Neither party offered any further bids and the auction was declared closed.

Following a luncheon recess, Consumer News raised its bid again by agreeing to assume $3.2 million in additional liabilities that had been included in the Dow Jones/Group W bid, so that both bids now called for the assumption of liabilities valued at $9.3 million. Appellant characterized this increase merely as a "clarification" of its bid, but the bankruptcy judge rejected this view of the increase, stating that it changed a closed bid and that it was accepted because it would be unfair to creditors and equity holders not to accept it. No objection was lodged to Consumer News' new, revised offer.

At this point in the auction the undisputed elements of the two offers were as follows:

|  | Consumer News | Dow Jones/Group W |
|---|---|---|
| Cash | $140.0 M | $125.0 M |
| Assumed Liabilities | 9.3 M | 9.3 M |
| Guaranteed Future Revenues | 0 | 7.6 M |
| Break-up Fee (est.) |  | −8.2 M |
| Total | $149.3 M | $133.7 M |

Only the value of the unguaranteed "soft money" future revenue portion of Dow Jones/Group W's bid remained at issue. The bankruptcy court decided to conduct an evidentiary hearing to determine its worth.

The parties dispute the outcome of the hearing. Consumer News asserts the hearing revealed that the "soft money" portion of Dow Jones/Group W's bid was worthless, and that at the end of the hearing, "the merits of the competing bids were clear." Nonetheless, there was testimony at the hearing supporting Dow Jones/Group W's valuation of over seven million dollars. The then president of Financial News testified that with the news gathering capability and financial assets of Dow

Jones/Group W he believed his company's future revenue projections—upon which Dow Jones/Group W relied in making its valuation—could be met. In response to evidence that Dow Jones/Group W's own projections predicted substantially lower revenues than Financial News' projections, the senior vice president of Dow Jones explained that his company's lower estimates were designed to evaluate Financial News as a potential acquisition and hence were conservative figures. He added that Dow Jones/Group W expected to exceed these internal estimates. The president of Group W Satellite Communications similarly described the Dow Jones/Group W projections as a "worst case scenario" and stated he believed Financial News' projections were realistic. At the conclusion of this hearing, the creditors were divided on the question of which bid was preferable. The bankruptcy court gave no indication on how it would rule.

On the morning following the hearing, Dillon Read, Dow Jones/Group W's investment bank, submitted an offer directly to Financial News to purchase approximately three-quarters of the unguaranteed revenue sharing component of the debtor's assets for $17 million in cash upon sale of the media assets to Dow Jones/Group W. The debtor asked the bankruptcy court to delay its ruling on the auction so that the Dillon Read proposal could be brought before it. The bankruptcy court immediately communicated with the parties via a teleconference call to determine whether to consider Dillon Read's proposal. Financial News and Dow Jones/Group W contended that the bankruptcy court should consider the proposal as additional evidence probative of the value of the Dow Jones/Group W bid. Consumer News vigorously objected, insisting that the proposal constituted a new bid by a competitor after the close of bidding.

The bankruptcy court ruled that it would consider the Dillon Read proposal and thereafter give appellant a chance to revise its own bid. It is unclear whether Dillon Read's proposal was viewed as additional evidence pertinent to the value of Dow Jones/Group W's bid or as a new bid by Dow Jones/Group W. At one point, the

bankruptcy court stated it would "take the evidence of this as additional probative evidence ... [T]his is certainly probative of the value of the contingent revenue stream;" it also noted, "I think it's a change in [Dow Jones/Group W's] bid." In the end, the trial court reopened the auction to allow both parties to offer revised bids. During a May 9 teleconference the bankruptcy court ruled definitively that it considered the Dillon Read proposal to be evidence of the value of the Dow Jones/Group W bid rather than a new bid. It afforded Consumer News an opportunity to submit a new bid; appellant offered an additional $5 million in cash plus an unguaranteed participation in Financial News' future revenue stream. When Dow Jones declined to bid further, the court declared appellant the winner.

## PRIOR PROCEEDINGS

We turn now to the judicial proceedings in the bankruptcy and district courts. In an opinion and order dated May 10, 1991, the bankruptcy court confirmed the sale of the debtor's media assets to appellant based on its May 9 offer. The court stated that at the end of the May 7 hearing, "if Dillon [Read] had not submitted its offer we would have found for CNBC." The court further observed that

> [i]f ever there was a situation that "[s]ome play must be allowed for the joints of the machines" ... this is one of them. To further the purposes of reorganization, bankruptcy judges must have substantial freedom to tailor orders to meet differing circumstances. *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983). This has been done here.

CNBC appealed to the district court avowing that because the bankruptcy court had improperly reopened the bidding for consideration of the Dillon Read proposal, it had been compelled to bid an additional $5 million. It believed it was entitled to a rebate in that amount.

The district court ruled "there was no clearly prevailing party at the close of bidding and neither Dow [Jones/Group W] nor

CNBC sought to revise its bid. Instead, a third party (Dillon Read) came forward with a hard cash offer to the estate for the portion of Dow [Jones/Group W]'s bid the value of which was the central subject of dispute before the court." *In re Financial News Network, Inc.*, 134 B.R. 737, 741 (S.D.N.Y.1991). The district court also noted that both CNBC and Dow Jones/Group W understood that the bankruptcy court had "consciously and openly adopted an unconstrained method of auction from the beginning" and that reopening the hearing was "not inconsistent with the rules by which this auction was conducted or with any reasonable expectations that the bidding parties or the estate may have had." *Id.* at 742.

The district court accordingly concluded that the bankruptcy court had not abused its discretion in considering the Dillon Read offer as additional evidence probative of the value of Dow Jones/Group W's bid, which had brought about appellant's revised bid, and that Consumer News was not entitled to a $5 million rebate. From this order Consumer News appeals. We affirm.

## DISCUSSION

■ Having set forth the facts and prior proceedings in some detail we proceed to an analysis of the law. The district court's order affirming the bankruptcy court's sale is subject to our plenary review. *See In re PCH Assocs.*, 949 F.2d 585, 597 (2d Cir. 1991). Such review allows us to undertake an independent examination of the factual findings and legal conclusions of the bankruptcy court. Its factual determinations are binding unless clearly erroneous; its legal conclusions are reviewable *de novo*.

The primary thrust of appellant's sole point on appeal is that the bankruptcy court improperly permitted Dow Jones/Group W to submit a new bid after the close of bidding, forcing it to raise its offer in order to prevail at the auction of Financial News' media assets. To support this position it relies heavily on *In re Gil–Bern Industries, Inc.*, 526 F.2d 627, 629 (1st Cir.1975), which focused on the integrity

and finality of judicial sales in stating that "it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed."

■ We do not question the reasoning of *Gil–Bern* as a general proposition, but it should not be blindly applied so as to reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it. An insistence on bids being completely comparable, while without doubt useful, should not lead to such a rigid adherence to the procedures that govern the sale as to elevate them over the substance of the bankruptcy court's principal responsibility, which is to secure for the benefit of creditors the best possible bid. In the past we have noted that in bankruptcy proceedings substance should not give way to form, and that a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed. *See Matter of Vintero Corp.*, 735 F.2d 740, 742 (2d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). Consistent with this aim, we have observed that "[f]irst and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code." *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983).

*Gil–Bern* and its progeny concerned relatively straight-forward asset sales with simple cash offers from rival bidders in which one party emerged clearly victorious at the auction, and the losing party then made a belated attempt to trump the winning bid. In those circumstances, *Gil–Bern* properly reasoned that accepting the post-auction higher bid would be a "penny wise and pound foolish" practice, because it would encourage parties to submit low formal bids and then come back, if necessary, with higher post-auction offers. *See Gil–Bern*, 526 F.2d at 628–29. Or, perhaps

worse, to permit the acceptance of post-auction bids might well entirely discourage bidding at bankruptcy sales.

This record presents a far more complicated bidding scheme. No clear winner emerged from the May 7 hearing. The creditors were split as to which offer presented the best terms, and the bankruptcy court did not rule. The competing parties and the bankruptcy court had, in the court's own words, "a yeoman's task to sift through the accounting forecasts, investment bankers' hyperbole, and media plans involving prolix compartmentalization of television viewing times." Hence, *Gil–Bern* is an inapt precedent where the bidding scenario, like the present one, is complex and fluid. Interestingly enough, in *In re Muscongus Bay Co.*, 597 F.2d 11, 12–13 (1st Cir.1979), the First Circuit itself recognized that the bright-line rule of *Gil–Bern* could not be applied in every case and held that a bankruptcy court "acted within the scope of its broad discretion" in extending the bidding period upon receiving a late offer. It is plain therefore that unusual situations may "justif[y] the exercise of the judge's discretion to refuse confirmation" of the highest auction bid. *The East Hampton*, 48 F.2d 542, 545 (2d Cir.1931) (Hand, J.) (admiralty case). To hold otherwise would seriously compromise the necessarily broad discretion of the bankruptcy court.

■ Dillon Read's post-auction proposal did not constitute an attempt by Dow Jones/Group W to circumvent the auction process. Instead it was consistent with both the rules by which this particular auction was conducted and the reasonable expectations of the bidders. We note the bankruptcy judge allowed appellant to amend its own offer on May 7, after bidding was officially closed. Consumer News then voiced no objection to this flexible bidding procedure, which at that juncture benefitted it. The Dillon Read proposal was entertained in the same spirit and on the same basis. In so acting on each occasion the bankruptcy court acted well within its discretion.

Further, it is not clear whether appellant's characterization of the Dillon Read offer as a new bid by Dow Jones/Group W is correct. The bankruptcy court did not explicitly decide whether the Dillon Read proposal could be imputed to Dow Jones/Group W, finding such an inquiry speculative and noting the hard fact that Dillon Read was willing to pay cash for the debtor's future income stream. Even were Dillon Read's offer imputed to Dow Jones/Group W, we remain persuaded that the offer is properly described as a clarification of the value of Dow Jones/Group W's bid and not a new bid.

Moreover, the involved and somewhat speculative nature of the assets being sold required the bankruptcy court to adopt a fluid bidding process that allowed both parties at various times to amend their offers in an attempt to arrive at a fair valuation of the assets. There was, according to the bankruptcy court, an "ebb and flow" throughout the auction, which "required each participant to tack with the change of the wind." In our view, this process best balanced the competing considerations of finality in the bidding process and fairness to the bidders against the interests of creditors in securing the highest sales price. There are cases where the bankruptcy court's discretion must be sufficiently broad so that in making its decision it can compass these competing considerations as best it can. We think this is such a case.

## CONCLUSION

The order of the district court is accordingly affirmed.