**In re John Joseph EDWARDS, Debtor.**

**Bankruptcy No. 96–17868DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 15, 1998.

See also 228 B.R. 573.

554

Kenneth A. Jacobsen, Media, PA, for Debtor.

Christine C. Shubert, Chapter 7 Trustee, Tabernacle, NJ.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA.

### MEMORANDUM OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

On October 25, 1995, John Joseph Edwards ("Debtor") filed his first bankruptcy case, a Chapter 11 reorganization which he intended to fund with the proceeds of a claim to be prosecuted against Pilot Corporation ("Pilot"), a company in which he holds a one-third stock interest and from which he had been severed as chief executive officer. The bankruptcy case was dismissed on June 17, 1996 as I found his claim too speculative a foundation upon which to build a reorganization. Exhibit M–4 (Memorandum Opinion dated June 17, 1996, Case No. 95–18405).[1]

A second Chapter 11 case was filed on August 20, 1996; the intended source of funding that reorganization plan was the sale of Debtor's residence and his Pilot stock. Notwithstanding the avowed objective of the reorganization, Debtor failed to take the action necessary to accomplish his goal. His residence was foreclosed upon after vigorous resistance to the mortgagee's effort to obtain relief from stay failed, and he took no steps to sell his stock.

On February 11, 1997, the Chapter 11 case was converted to a case under Chapter 7, and Christine Shubert, Esquire was appointed interim, and then permanent Chapter 7 trustee. One of her first acts as trustee, after conducting her initial due diligence review of the estate to be administered, was to engage a professional to appraise the value of the Pilot stock in furtherance of the liquidation of this, the Debtor's most valuable asset. Informed as to the fair market value of this asset and recognizing that pending litigation would deter outside buyers from buying the stock, she identified the likely

---

1. I take judicial notice of the dockets of the Debtor's bankruptcy cases, all of which were assigned to me, as well as my prior written decisions in this case and Case No. 95–18405. Fed.R.Evid. 201 incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec.* *Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa. 1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

prospective buyers to be the other Pilot shareholders and proceeded to negotiate a sale. On March 12, 1998, the Motion of the Chapter 7 Trustee to Sell Assets (the "Sale Motion") was filed initiating the saga that reached its climatic conclusion with the final day of hearings on October 30, 1998. That Motion, as amended on the record of that hearing, seeks this Court's approval of a sale of Debtor's interests in Pilot Corporation and the Edwards Partnership to Richard Phillips and Wesley Wyatt for $5.2 cash, reimbursement of certain of the Trustee's taxes and a mutual release of all claims. The transaction is opposed solely by the Debtor.

Following the submission of briefs, the Sale Motion is now ripe for decision.[2] For the reasons stated below, it is granted.

## BACKGROUND

Pursuant to the Sale Motion, the Trustee originally sought to sell the Debtor's one-third interest in the Pilot stock and one-third interest in the Edwards Partnership (the "Equity Interests") to Richard Phillips ("Phillips"), Pilot's present chief executive officer, for $3.4 million. Also as part of the transaction, Phillips and Pilot and Andrew Drescher (together the "Phillips Group"), who actively supported the Phillips bid, agreed to waive multimillion dollar claims asserted against the estate.[3] The Trustee likewise agreed to provide a waiver of Debtor's claims against Pilot and Phillips.

In the first of many hearings on the Sale Motion, Steven Scherf, C.P.A. ("Scherf"), the Trustee's valuation expert, fixed a value of $2,745,000 on the Equity Interests. Exhibit M-3. His valuation opinion was premised on the sale of a minority equity interest which is, of course, what the Debtor owns in each entity. However, it quickly became clear that much more was at stake than the sale of a minority interest. Pending litigation in the District Court of New Jersey ("New Jersey Litigation")[4] pitted Wesley Wyatt ("Wyatt")

2. After the briefing schedule was concluded and while I was preparing this Opinion, Debtor submitted a Reply Memorandum which I have not reviewed as its submission was not requested and therefore was not authorized. As I have thoroughly reviewed the Debtor's Objections to the Trustee's Motion to Sell His Interests in Pilot Air Freight, His Interests in Edwards Partnership and All His Tort and Contract Claims to Richard Phillips ("First Objections"), Supplemental Objections to the Trustee's Motion, etc. ("Second Objections"), Debtor's Request for Judgment on the Trustee's Motion, etc. ("Request for Judgment"), Debtor's Supplemental Objection to the Sale of His Assets based on Newly Discovered Evidence ("Third Objections") and Debtor's Memorandum of Law in Opposition to the New Joint Bid to Purchase His Assets ("Debtor's Memorandum") in which he was given the opportunity to restate all his unresolved objections, I believe I am well acquainted with his positions and their support.

Also while the Sale Motion was under advisement, Debtor through his Delaware County Litigation counsel, filed a Motion to Discharge the Chapter 7 Trustee with certain correspondence attached as Exhibits A through J. A courtesy copy was sent to my Chambers. Disqualification of the Trustee and her counsel was sought in the Debtor's objection to the Sale Motion. The new motion is presumably in response to the Trustee's correct observation that the issue of disqualification was not properly before me as an objection to the Sale Motion. I have nonetheless made certain findings which may be dispositive of the new motion based on the record in this contested matter. I have not read the new pleading or its attachments, and presumably the new motion will be set for a hearing to the extent the issue is not precluded by these findings.

3. These claims are memorialized in three adversary proceedings filed in 1997 and placed in suspense pending the outcome of the Sale Motion: Pilot Air Freight Corp. v. John Joseph Edwards, Adv. No. 97–0035; Andrew Drescher v. John Joseph Edwards, Adv. No. 97–0039; and Richard G. Phillips, Adv. No. 97–0040.

4. The New Jersey Litigation was commenced in January 1998 by William and Thomas Edwards (the "Edwards Cousins") who contended that Wyatt's options to purchase Pilot shares from them were improperly obtained and invalid. Wyatt counterclaimed against, inter alia, Pilot, Phillips, the Trustee and her counsel who was serving as a Pilot director. This New Jersey Litigation embodied the struggle for ownership of Pilot which was further complicated when the Debtor's shares were put into play in this Court. Also at issue in New Jersey were claims of, inter alia, breach of fiduciary duty and conflict of interest. Given the pendency of the bankruptcy case, Debtor was not a party to this litigation. Rather his claims against Phillips, Wyatt and Pilot for, inter alia, improper termination of his employment contract and mismanagement of Pilot had been asserted in a separate action commenced in the Court of Common Pleas of Delaware County (the "Delaware County Litigation") in 1996. Additionally Debtor filed an adversary proceeding in this Court, Adv. No. 98–133

who claimed a 45% interest in Pilot through the exercise of certain stock options, against the Edwards Cousins, Phillips and Pilot. Initially Wyatt pressed this Court to decide the disputed ownership issue, claiming he was unable to frame a bid until he knew whether he was bidding for a controlling (45% + 331/3%) or a minority interest in Pilot.[5] On April 30, 1998, I entered an Order refusing Wyatt's demand, concluding that "the uncertainty regarding the ownership of Pilot stock has created an environment which has stimulated interest in the purchase of Debtor's shares and there may even be a risk to the Trustee depending on the results of an adjudication of ownership." *See* Memorandum/Order dated April 30, 1998 at 3 (Doc. No. 263/264 ("April 30 Decision")). Moreover, I held that this Court had no jurisdiction to hear the dispute surrounding the Wyatt stock claim which involved parties not before this Court.

That decision was apparently the correct one because Wyatt then tendered a bid for $3.6 million. While the Wyatt bid was $200,000 more than that of Phillips, it did not, and obviously could not, resolve any of the claims issues between Phillips, Drescher, Pilot and the estate. Thus, were the Trustee to accept the Wyatt bid, she would be left with the task of litigating objections to the Phillips, Pilot and Drescher claims. On the other hand, she would retain Debtor's claims against Pilot and Phillips.

On May 11 and June 17, the Trustee put on her evidence in support of a sale based on the Phillips offer. Her first witness was the business valuation expert, Scherf, who gave testimony regarding his appraisal of the Equity Interests as memorialized in his report, Exhibit M–3. Scherf's conclusions were vigorously challenged by Debtor's counsel, focusing in particular on the lack of control and

lack of marketability discounts he utilized as well as his failure to normalize Pilot's earnings before valuing the stock. As to the discounts, Debtor contended that none should be applied because the sale to Phillips would give him majority control. This objection, as even Debtor acknowledges, is now moot by reason of the subsequent bidding which has raised the purchase price to $5.2 million, a sum greater than the appraised value without *any* discounts taken. The Debtor, however, still presses his objection to fair value based on Scherf's failure to normalize earnings.

The Trustee then testified as to her due diligence and rationale for proposing the sale of the Equity Interests and release of claims for $3.4 million. She detailed the steps she took in evaluating the claims to be released and claims to be settled, including review of this Court's prior opinions (Exhibits M–4 and M–5), analysis of court and other documents, and meetings with the Debtor and his various counsel, both present and former. In particular, she met with the Debtor and Delaware County Litigation counsel Kenneth Jacobsen, Esquire in order to evaluate the Debtor's claims. From them she concluded that the litigation was essentially a strategy to provide leverage to the Debtor in a buyout of his Pilot stock. (N.T. 6/17/98 at 10). She also examined a letter dated November 10, 1995 from David Auten, a former attorney of Debtor, who acknowledged that Debtor's desire to sue Pilot was based on "revenge" and for that reason and others, he refused Debtor's request to file the lawsuit against Pilot at that time.[6] Exhibit M–6. Moreover, in interviewing other parties to the Delaware County Litigation, she became convinced that the litigation would be a long and costly

against the Edwards Cousins, Phillips, Wyatt and Pilot in April 1998. By agreement of the parties, that complaint and the motions filed in response to it have been placed in suspense pending the outcome of the Sale Motion.

**5.** Initially Phillips also sought to shore up his position vis-a-vis Wyatt by having his bid conditioned on the Court's finding that a certain agreement between the Pilot shareholders had been validly terminated. When it became clear

that I would not do so absent an evidentiary hearing which was beyond the scope of the Sale Motion, the condition was withdrawn.

**6.** Auten set forth the significant risks of such a lawsuit, including the fact that it could reduce the value of Debtor's own Pilot stock from the $6 million then offered by Phillips to perhaps zero, and would expose him to significant counterclaims with the attendant pressure and substantially increased legal fees.

affair,[7] and that at the end of the day, she might not be able to collect from Pilot. Additionally, she was worried that in seeking judgment against Pilot she would be undermining the value of the Pilot Stock the estate owned.

In short, Ms. Shubert did not ascribe much value to the Debtor's claims on their merits, although she admittedly had not secured a valuation of them. Rather she concluded from her interviews that the claims by and against the Debtor were a "wash" and had been asserted as a litigation strategy as part of the struggle for control of Pilot. However, while she placed no independent value on the Phillips Group's claims against the estate for purposes of establishing the fair market value of the assets to be sold, she recognized their importance as barriers to concluding the liquidation of the estate and making a distribution to creditors. Indeed judging by the litigation activities of these parties to date, it was apparent to her that the costs of pursuing and defending those claims would easily absorb the additional consideration offered by Wyatt. Her analysis was further impacted by the fact that the price offered for the Equity Interests far exceeded the claims against the estate, exclusive of Phillips/Pilot/Drescher. Exhibit M–7. The Trustee thus had within her reach a 100% with interest distribution with a significant return

to Debtor on his equity if the claims settlement could be rolled into the sale.

While Phillips and Wyatt were fashioning their bidding strategies, Debtor objected to any sale of the Equity Interests and this sale in particular which he viewed as being for insufficient value. Debtor argued that the Sale Motion should be denied to permit him to return to Chapter 11 to reorganize around his stock interest in some form of private offering.[8] I overruled the Debtor's objection insofar as it sought to preclude the sale of his Equity Interests by the Trustee. April 30 Decision. Debtor also argued that the Trustee should be directed to pay all the "non-insider" claims with the proceeds of the Debtor's equity in the foreclosed residence, approximating $800,000, leaving the Debtor free to sell the Equity Interests on his terms and litigate the claims. Concluding that the Bankruptcy Code did not allow the Trustee to make a distribution to some creditors (those holding undisputed claims) without assurance that there were sufficient assets to pay the other creditors (those holding disputed claims), I rejected that demand as well.[9] Debtor raised a number of other objections, some of which have been mooted by subsequent events which I will now describe, and some of which will be decided herein.

Following the Trustee's testimony, she rested, and no other party sought to present testimony. The only issue at that juncture

7. As the Trustee testified:

> The litigation itself, if it were to go forward, would be long and very protracted, that it was very convoluted, there were many issues involved. And I made the decision that the real asset was the actual Pilot stock in Pilot and the share of the [Edwards Partnership].
> N.T. 6/17/98 at 13.

8. After the initial Phillips offer was received, the Trustee heard from Wyatt who, like Debtor, favored conversion to Chapter 11 with her acting as Chapter 11 trustee and the disposition of the stock through an "IPO." The Trustee investigated that option in meetings with Wyatt, Debtor and his representatives and investment bankers from Alex Brown & Co. She ultimately concluded that the venture was too risky and costly an undertaking for the estate and its attendant delay in the administration of the case would prejudice creditors. Exercising her business judgment, that proposal was rejected. Nonetheless, Debtor sought to pursue it further and filed a Motion to Convert to Chapter 11. It has been placed in

suspense pending the outcome of the Sale Motion.

9. Debtor has renewed this argument in the form of a supplemental objection to the Sale Motion. Claiming newly discovered evidence in the form of information regarding undistributed earnings to Debtor from Pilot, Debtor finds even more basis for his request that he should be permitted to recover his Equity Interests while his non-equity interests should be utilized to satisfy claims against the estate. Notably there is nothing in the record of this contested matter that would allow me to conclude that claims against the estate can be satisfied from the Debtor's non-equity interests. In the first place, the "newly discovered evidence" was never made a part of the record of this proceeding. And even if a proper evidentiary record had been made (versus the attachment of unauthenticated documents as an exhibit to a pleading), I still cannot conclude that the Trustee has sufficient assets to pay *all* claims without resort to liquidation of the Equity Interests.

that required further hearing was whether the sale met the good faith requirement of *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.1986). However, rather than proceed directly to this inquiry, the Debtor, Wyatt and Phillips, with the consent of the Trustee, requested an adjournment of the Motion in order to pursue settlement of all of their disputes which, as noted above, extended beyond the contours of the Motion *sub judice*. Resumption, and any further testimony, was scheduled for July 20 and 21, 1998.

Because of disagreements that had surfaced regarding the testimony of remaining witnesses [10] and in response to an objection by Wyatt to the fairness of the bidding process that allegedly kept him from understanding the basis of the Trustee's valuation of the claims portion of the transaction, I entered an Order on July 16, 1998 establishing certain procedures for concluding the sale. Wyatt, having had the opportunity to hear the Trustee's testimony, including her responses to his counsel's examination, would be allowed to submit a further bid by July 20. Moreover, Phillips and Wyatt both were permitted to supplement the evidentiary record if they so desired. Order dated July 16, 1998 ("July 16 Order").

Pursuant to the July 16 Order, Wyatt now submitted a bid of $5 million in cash supplemented by a bond of up to $3 million to secure payment of the Pilot Group claims when liquidated. Bid of Wyatt for Assets of Debtor dated July 20, 1998, Doc. No. 334. On the day of the hearing, however, a "new" bidder emerged. Phillips had collaborated with the Pilot franchisees and key employees (the "Franchisees"), many of whom had supported his bid in filed pleadings with the Court, and now together proffered the sum of $5.1 million with the mutual claims settlement. Asking for time to retain counsel, the Franchisees, absent objection by any party, were given a short adjournment, only to return to ask for a longer one. At the request of newly retained counsel who contended the size and geographic separation of the Franchisees as well as summer vacation schedules made quicker action infeasible, and again absent the objection of any interested party,[11] the proceeding was adjourned until September 23, 1998 on the condition that the three extant bids would be maintained.

In the interim, the Trustee filed a motion for an Order setting bidding procedures, and a hearing was held thereon on the continued date. The Order approving the bidding procedures subsequently entered required any new bid to be in writing and submitted to the Trustee 48 hours before the hearing along with evidence of the bidder's financial ability to perform its bid. Doc. No. 369. The existing bidders, defined in the motion as Phillips, Wyatt and Phillips and the Franchisees, were exempt from the requirements of the Order. The Order contemplated an auction at the next (and final) hearing date now set for October 30 in which newly qualified as well as the existing bidders could raise their bids.[12]

On October 30, in a hearing with all interested parties and their counsel present, I was advised that there was a new bid: Wyatt and Phillips had joined together to proffer a cash bid of $5.2 million plus the claims settlement. Additionally Pilot agreed to reimburse the Trustee for any federal tax liability she may

---

**10.** Wyatt and the Debtor objected to the sale to Phillips on, *inter alia*, good faith grounds. Likewise the Phillips Group made clear on more than one occasion that they maintained the same objection to a sale to Wyatt. As part of the July 16 Order, I required the parties intending to call witnesses to file a list of same with the subject matter of their testimony as well as a memorandum explaining how the proffered testimony was or was not within the scope of the *Abbotts Dairies* inquiry. The submissions not unexpectedly disclosed a very expansive view of the appropriate inquiry for the purpose of satisfying the *Abbotts Dairies* test, and promised to be the subject of further contention at the scheduled hearing.

**11.** Only the Trustee's counsel, while noting the absence of any real alternative to acceding to the request, expressed displeasure with yet another delay.

**12.** In a colloquy with the Trustee's counsel, I asked him what he would do if someone who had not been previously qualified, tendered a higher bid at the hearing. In a somewhat prescient response, he indicated that he expected that the Court would use its equitable powers to allow the bid. None of the other interested parties expressed a contrary view.

incur as owner of the shares as a result of undistributed profits of Pilot which is an S corporation.[13] There was no writing and there was no testimony regarding the new bid. Its basic terms were placed into the record by Phillip's counsel. The sole evidentiary support for the new bid is a document memorializing the global settlement reached between the Edwards Cousins, Wyatt, Phillips, Pilot and Pilot Holding Company ("Holding"), an entity in formation and contemplated to be joined by various other parties involved in disputes with them (the "Litigation Parties"), including, *inter alia*, the Debtor, the Trustee and her counsel. Phillips Exhibit 1.

The Settlement Agreement provides for the settlement of all disputes between Wyatt, Phillips, Pilot and the Litigation Parties, establishes the future ownership and management of Pilot and Holding and details the arrangement between Wyatt and Phillips with respect to the purchase of the Equity Interests. Specifically, the Settlement Agreement provides for the formation of Holding to hold the Equity Interests if purchased from the estate [14] as well as the Phillips and Wyatt options and all the remaining ownership shares of Pilot and interests in the Edwards Partnership. It sets forth how the net income of Pilot will be distributed to Holding and how Holding will distribute its net income to its shareholders. *Id.* £. Phillips and Wyatt are to own equal shares or interests in Holding, thereby mooting all ownership disputes and resolving the New Jersey Litigation. Settlement Agreement ¶ 1. Phillips is named Chairman, President and CEO of Holding and Pilot. *Id.* ¶ 6(c). However, recognizing that their equal ownership of shares may result in deadlock on certain major issues, a detailed alternative dispute resolution process is established. *Id.* ¶ 5. The purchase price of the Equity Interests would be provided by Phillips and Wyatt equally. *Id.* ¶ 3. The Phillips and Wyatt stock options are validated and payment to the Edwards Cousins pursuant to the option agreements to purchase their Pilot shares, all of which was at issue in the New Jersey Litigation, is provided.[15] *Id.* ¶¶ 5,6. Phillips and Wyatt will receive employment agreements with Pilot through December 1, 2003 providing salaries of $300,000 plus, and in Phillip's case, a guaranteed bonus of $400,000 and other associated benefits. The Edwards Cousins will likewise receive an employment agreement with Pilot, only it shall expire on December 31, 2008, and the compensation will be set by Pilot's President. *Id.* ¶ 6. The Phillips law firm shall remain as general counsel to Pilot with a specified annual retainer of $364,000, *id.* ¶ 12(a), and Wyatt has the right to "indirect compensation or other pecuniary benefit from Pilot Holding or Pilot" through construction contracts to a related entity. *Id.* Wyatt and Pilot are moreover entitled to be "reimbursed" by Pilot for their reasonable legal fees incurred in connection with the bankruptcy case, the New Jersey Litigation, the Delaware County Litigation and the Settlement Agreement. *Id.* ¶ 12(b). Finally, Wyatt and Phillips each received a right of first refusal with respect to sale of the other's Holding stock and the right after 30 months to buy the other's 50% ownership interest in Holding at a price to be determined then. *Id.* at ¶ 7.

Notwithstanding the identification of Debtor as one of the Litigation Parties to the Settlement Agreement, Debtor has not agreed to its terms. Indeed, according to his counsel, he was neither consulted nor advised of its terms in advance of the hearing.[16]

---

**13.** No one quantified that number which presumably adds some amount to the value of the offer.

**14.** The Settlement Agreement provides that "Phillips, Wyatt and/or Holding Company will bid for and use all reasonable efforts to acquire from Shubert at the Auction or otherwise [Debtor's] Assets...." Settlement Agreement ¶ 3. It contains no details as to what those efforts should be, including the price to be paid.

**15.** The option price for the Wyatt shares is fixed at a range of values subject to further negotiation between the Edwards Cousins and Wyatt. Provided the optioned shares are conveyed to Holding, Holding shall disburse to Phillips and Wyatt the amount of the option price to be paid to the Cousins. *Id.* ¶ 4.

**16.** Phillips and Wyatt explained that the Settlement Agreement had been finalized that morning, a representation supported by their request that the commencement of the hearing be delayed so that they could conclude settlement ne-

After establishing that there were no further bids for the Equity Interests, the Trustee accepted the new bid.[17] The Debtor cried foul, arguing that the new bid represented an impermissible (and perhaps criminal) collusion between Phillips and Wyatt which deprived him of the benefit of the auction process by which his assets were to be sold. Given the lack of time the Debtor had to frame his objection, I readily granted his request to submit a brief with legal support for his opposition and gave him the opportunity to supplement the evidentiary record at a continued hearing which he rejected. Given the twists and turns in this protracted proceeding, I also asked him as the lone objector to identify the other pending grounds for objection that had not been mooted by subsequent events. Phillips/Wyatt and the Trustee were afforded the opportunity to file responsive briefs. All such briefs have now been filed, and the matter is ripe for decision.

## DISCUSSION

### I.

The Trustee seeks to sell the Equity Interests pursuant to 11 U.S.C. § 363(b) which authorizes a trustee, after notice and hearing, to sell, other than in the ordinary course of business, property of the estate. While the only conditions imposed by the statute would appear to be the requirement of notice and hearing, a body of case law has developed that provides the bankruptcy court with guidance in ruling upon such requests.

### A.

Before turning to the merits of the Trustee's request, I must resolve a procedural objection that Debtor contends is a barrier to the approval of the sale to Phillips/Wyatt. Perhaps because of her belief that the only parties interested in purchasing the Equity Interests were the parties with existing Pilot interests of one form or another, the Trustee did not at the inception of this matter seek an Order setting bidding procedures. Given the litigious nature of the parties and the fact that the Trustee was not merely selling the Equity Interests but also certain claims and that payment by Phillips was intended to be made by cash and a release of other unliquidated claims, the proceedings spurned a number of collateral disputes involving the sale process. In the absence of bidding procedures established by Order of the Court, it was necessary for me to address these issues as they were presented. The April 30 Decision and July 16 Order were *sua sponte* rulings intended to promote an orderly and fair sale proceeding. One such provision ordered gave the interested parties a second chance to bid after the trustee rested her case. No one challenged that ruling and indeed the potential bidders thereafter submitted higher bids.

Shortly thereafter, the Trustee filed a motion requesting the court to establish bidding procedures.[18] Essentially exempting the current bidders from its terms, it provided for publication of notice of sale and submission of bids 48 hours prior to the final auction date with evidence of financial ability to per-

gotiations. As time may have precluded discussions with Debtor, I encouraged the parties to reach out to the Debtor who appeared to be a significant impediment to the realization of the settlement that they had worked so long and hard to achieve. Concurrently I allowed briefs to be filed on the remaining objections with the hope that instead of more legal arguments, I would get a report of settlement with the Debtor. Regrettably, that has not happened.

17. Notably, the three other bids were not withdrawn. Thus, were I to accept Debtor's bad faith argument, the Trustee might move to accept the next highest bid, *i.e.*, that of Phillips and the Franchisees. Debtor, however, contends that the Trustee must be disqualified from taking any further action with respect to the sale as a sanction for recommending the Wyatt/Phillips bid.

Rather, she must yield to the Debtor who would then recommend to the Court which of the other Wyatt and Phillips bids he favors. Since I am granting the Trustee's Sale Motion, I need not address this unprecedented request which seemingly could involuntarily embroil the Trustee in the continued litigation if the Wyatt bid of $5.0 million and the $3.0 litigation fund was chosen.

18. It was never established why the Trustee's counsel filed the motion to establish bidding procedures in the middle of the bidding. Perhaps the Trustee was frustrated that the Sale Motion had been pending for almost ten months and she had never secured a deposit from Phillips or perhaps she was being responsive to a footnote in an earlier Order that bemoaned the lack of bidding procedures. I will assume it was filed to help get this matter concluded once and for all.

form. Wyatt and Phillips and the Franchisees were exempted from the requirements as existing bidders but would be allowed to increase their bids at the auction.[19] As apparent from the foregoing facts, the publication of notice did not elicit any new persons to bid at the auction nor did an existing bidder raise his bid. Rather two existing bidders, otherwise exempt from the requirements of the bidding order joined forces to submit a combined, and higher bid. Neither the Trustee who sought the procedures nor another bidder who would be protected thereby complains that the new bid was presented at the hearing and not 48 hours before. Rather the Debtor, who is the beneficiary of the higher bid, contends that it should be rejected as untimely.[20]

■ The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting the sale. In *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558 (8th Cir. 1997), the Eighth Circuit Court of Appeals enunciated the rationale for this policy.

> [W]e are also cognizant that an unwavering adherence to formality is not normally advisable in bankruptcy cases. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir.1983)("[A] bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code."). Finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely

extend their best and highest offers at the auction itself. [Citation omitted.] This, in turn, redounds to the benefit of bankruptcy estates in general by increasing a trustee's ability to command top dollar for items sold.

But these are not the only elements at play during bankruptcy sales. As a counterweight, the court must also remain mindful of the ubiquitous desire of the unsecured creditors, and a primary objective of the Code, to enhance the value of the estate at hand. [Citation omitted.] The existence of these competing considerations in judicial sales has not gone unheeded in the First Circuit, as that court has explained, in cases subsequent to Gil–Bern, that "th[e] policy [of inspiring confidence in sales under the supervision of the court] must be weighed against the purpose to be achieved by these judicial sales, which is to benefit the creditors and debtor." *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 14 (1st Cir.1978).

In fact, *Gil–Bern* itself did not completely disregard the tightrope a bankruptcy judge must navigate when presiding over judicial sales. The court there held that, absent any local rule to the contrary, the judge was constrained to confirm the highest bid submitted pursuant to the procedure described in the notice of sale. [*In re*] *Gil–Bern*, 526 F.2d [627] at 628–29 [(1st Cir.1975)]. Despite what the court viewed as the "prima facie meaning" of that notice, however, it determined that the judge's approval of a later bid would be affirmed if the bankruptcy court followed a known custom of allowing additional offers at confirmation hearings. *Id.* Underpinning this reasoning was the First Circuit's recognition that the participants in a judicial sale should receive what they have

19. When Phillips, Wyatt and the Franchisees resisted the Trustee's requirement of a deposit as an *ex post facto* imposition, I refused to approve the deposit requirement for other bidders as discriminatory.

20. The absurdity of this position is apparent. Were I to agree with the Debtor, the Trustee would be able to accept the next highest bid, *i.e.*, Phillips and the Franchisees, which has never been withdrawn. The estate would receive less

consideration, and since the purchase price is sufficient to pay all claims, the Debtor's objection would cost him $100,000. Seemingly, this is not the result that Debtor seeks, and this Court is not inclined to be the architect of a ridiculous result. Presumably Debtor presses this objection in concert with his demand that he, not the Trustee, be allowed to recommend the prevailing bid. Since I will not bar the bid on these procedural grounds, I need not address that demand.

"reason to expect." *Id.* at 628; *see also Munro Drydock,* 585 F.2d at 16 ("It is important, in the ordinary case, to honor the expectations of those bidding at the sale."); *In re Wintex, Inc.,* 158 B.R. 540, 545 (D.Mass.1992) ("[T]he hallmark of *Gil-Bern* is ... fealty to bidders' expectations.").

By implicitly utilizing bidders' reasonable expectations as a guidepost in reviewing the propriety of a bankruptcy court's actions, the First Circuit charted what we feel is a logical path in balancing the need for finality against the interest in maximizing the estate's worth. The concern the emphasis on finality is intended to serve, encouraging confidence in judicial sales, is satisfied so long as members of the public are treated in an anticipated manner. Thus, employing a sliding scale approach, the importance of estate enhancement diminishes as an auction participant's reasonable expectations, and the gravity of finality, increase. At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings. [Citations omitted.] In other situations, where the sale had not progressed to a comparable plateau, a reviewing court should evaluate the bankruptcy judge's decisions on a case by case basis, with due regard both for the parties' expectations and the judge's broad discretion to weigh the multifarious interests involved.

To summarize, we think that the important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted and in compliance with the bidders' reasonable expectations. *See Consumer News & Bus. Channel Partnership v. Financial News Network, Inc. (In re Financial News Network, Inc.),* 980 F.2d 165, 170 (2d Cir.1992) (commenting that submission of post-auc-

tion proposal was consistent with both the rules of the auction and the participants' expectations). We realize that this is a deferential standard, but we feel it provides the bankruptcy court, in the first instance, with ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets. "The bankruptcy court must be accorded sufficient discretion to decide the truly close cases as best it can in view of these competing considerations." *Muscongus,* 597 F.2d at 13; *see also Financial News,* 980 F.2d at 170 ("There are cases where the bankruptcy court's discretion must be sufficiently broad so that in making its decision it can compass these competing considerations as best it can.").

107 F.3d at 564–565.

■ In this case the bidding procedures order functioned to identify in advance all potential bidders and allow the Trustee to ascertain their creditworthiness. Whether Phillips/Wyatt are deemed to be existing bidders jointly as they were individually, a position advanced by the Trustee or a new bidder as claimed by Debtor, I find no justification for enforcing the order in the literal manner urged by Debtor. Rather I find that the Wyatt/Phillips bid is contemplated by the exception to the advance written bid requirement for existing bidders.[21] Stated in another way, allowing the bid does not upset the reasonable expectations of any party, including the Debtor who was aware that extant settlement discussions might result in an accommodation between Phillips and Wyatt. Moreover, the Trustee's counsel, upon being expressly questioned by me at the hearing on the bidding procedures motion, stated that if he received an untimely but better bid, he would ask that I allow it to be considered. The Debtor, presumably in agreement then, remained silent in the face of the Trustee's announced intention. To disallow this bid would be to put form over substance. It would not promote fairness and confidence in the bidding process as no bidder complains

---

21. Wyatt and Phillips had been identified in advance and their resources were known based on their prior bids.

that the sale has been compromised; it does not undermine the finality of the sale as it was presented before the auction was concluded.[22] All that rejection of the bid accomplishes is the elimination of a higher and better offer for the assets. Balancing these considerations, as I must, strongly militates against striking this bid. Refusing to do so, I will now consider the merits of Debtor's objections.

### B.

 The seminal and controlling case in this district on the issues *sub judice* is, of course, the decision of the Third Circuit Court of Appeals in *Abbotts Dairies, supra.* It is to this decision I turn first to set forth the principle upon which the Debtor relies to urge that I reject the proffered sale as a matter of law. *Abbotts Dairies* informs that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." 788 F.2d at 150. Good faith in the context of a bankruptcy sale

> speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders.

*Id.* at 147 (*quoting In re Rock Industries Machinery Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978)). *See also Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 389 (2d Cir.1997) (also adopting *Rock Industries* definition of good faith).

22. *Compare Kabro Associates v. Colony Hill Associates (In re Colony Hill Associates),* 111 F.3d 269, 272 (2d Cir.1997) (bankruptcy judge justified in excluding late bid where sale would have to be adjourned to allow it to be evaluated by the Debtor and creditors who sought acceptance of another bid).

23. Section 363(n) complements the court's authority to withhold approval of sales lacking in good faith by reason of finding collusion between the purchaser and other bidders by granting the trustee express power to avoid a sale "if the sale

 Debtor contends that such a finding of good faith eludes here where the two bidders have joined forces to buy the Equity Interests. Debtor focuses on the language of § 363(n) that prescribes avoidance of a sale "if the sale price was *controlled by* an agreement among potential bidders at such sale."[23] According to Debtor, where two bidders abandon their bids and mutually agree to submit a single joint bid, that agreement controls the sale price by eliminating the competitive process. Evidence of the impropriety of their agreement is underscored here, according to Debtor, by the bidders' receipt of substantial benefits in the form of salary contracts, payment of legal fees, and future employment under their agreement.

In *Lone Star Industries, Inc. v. Compania Naviera Perez Companc (In re New York Trap Rock Corp.),* 42 F.3d 747 (2d Cir.1994), a case cited in favor and in opposition to the Sale Motion, the Circuit Court interprets the meaning under § 363(n) of an agreement to control the sale price. In *Lone Star,* the debtor sought to sell its wholly owned subsidiary ("CACP") which owned a 50% interest in a cement company ("CSM"). There were three bidders for the asset: the other 50% interest holder in CSM, Perez–Patagonica; Petroquimica and Loma Negra which submitted the highest bid. Without disclosure to Lone Star or the bankruptcy court, Loma Negra signed an agreement to purchase Perez–Patagonica's 50% interest in CSM while its bid was pending. Petroquimica withdrew its bid, and at the sale hearing, Perez–Patagonica neither appeared nor increased its bid. The court authorized the sale to Loma Negra as highest bidder. Learning of the agreement after the sale was concluded, the debtor commenced an adversary proceeding

price was controlled by an agreement among potential bidders at such sale...." It follows that if a sale can be avoided because the price was controlled by potential bidders that it should not be approved if the court finds that the potential bidders have controlled the price. I agree with Debtor, therefore, that, § 363(n) cases are instructive in understanding the line between unlawful collusion and permissible collaboration. *In re Stroud Ford,* 163 B.R. 730, 732 (Bankr. M.D.Pa.1993).

contending, *inter alia,* that Perez–Patagonica and Loma Negra violated § 363(n) by entering into a secret agreement to control the bankruptcy sale price of the CACP stock. The bankruptcy, district and circuit courts disagreed, all concluding that the debtor did not prove that the parties colluded to *control the price* received by the debtor at the bankruptcy sale. In so determining, the courts distinguished between an agreement that affects price and one that controls it. As that distinction is central to my finding against the Debtor, it is useful to flesh out the Second Circuit's analysis in some detail.

> An agreement to "control" the sale price is very different from an agreement that "affects" the sale price. To "control" a price is to "exercise restraining or directing influence over" it; to "regulate" or "curb," "dominate," or "rule" it. Webster's Third New International Dictionary, 496 (G. & C. Merriam Co. 1976 ed.). In such context the term "control" implies more than acts causing an incidental or unintended impact on the price; it implies an intention or objective to influence the price. This interpretation also finds support in the legislative history. Congress explained that § 363(n) is "directed at collusive bidding on property," (emphasis added) H.R.Rep. No. 595, 95th Cong., 1st Sess., at 346 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6302. "Collusion" is defined as "secret cooperation for a fraudulent or deceitful purpose." Webster's Third New International Dictionary 446 (G. & C. Merriam Co. 1976 ed.). The use of the term "collusive" indicates that Congress intended in Section 363(n) to prohibit only agreements that are intended to control a sale price, and not all agreements having the unintended consequence of influencing a sale price—*i.e.,* not all agreements that affect a sale price.

42 F.3d at 752. *See also Gucci,* 126 F.3d at 390 (must be an agreement to influence the sales price and the influence "must not be simply a by-product or unintended consequence" for the agreement among potential bidders to come within the prohibition of § 363(n)); *Landscape Properties, Inc. v. Vogel,* 46 F.3d 1416, 1426 (same); *Birdsell v. Fort McDowell Sand and Gravel (In re San-*

*ner),* 218 B.R. 941, 944 (Bankr.D.Ariz. 1998)(same).

The Bankruptcy Court for the Eastern District of New York had cause to apply this principle recently in *In re Bakalis,* 220 B.R. 525 (Bankr.E.D.N.Y.1998). At issue was the Chapter 7 trustee's sale of the debtor's controlling interest in a bank. After auction, the sale was confirmed to Olympian Holdings, LLC ("Olympian"), the second highest bidder based on the trustee's evaluation of the risks inherent in the conditions attached to the highest bid. Atlantic, the high bidder, raised a number of objections on appeal, including Olympian's good faith purchaser status which is relevant here. In rejecting Atlantic's bad faith argument, the court stated, referring to *Gucci, supra:*

> Similarly in this case, Atlantic has made no showing that the activities of [Olympian] or its allies were "specifically directed" at controlling the sale price of the Olympian Bank shares or taking advantage of other bidders. It would seem far more likely that [Olympian] or its allies were driven by a desire to avert a takeover or to provide stability at Olympian Bank during the post-conversion period, a time of great uncertainty. To the extent, if any, that these activities affected the price of the bank shares or worked an advantage in favor of [Olympian], such outgrowth would be deemed by-products or unintended consequences and would not, under *Gucci,* implicate the good faith purchaser status of [Olympian].

*Id.* at 538.

The Trustee, Phillips and Wyatt contend that there can be no finding of collusion here as all parties and the Court were aware of the efforts being made to reach a global resolution of all litigation and that the agreement that accomplished this, *i.e.,* the Settlement Agreement, was fully disclosed to the Court. They point to, *inter alia, G–K Development Co., Inc. v. Broadmoor Place Investments, L.P.,* 994 F.2d 744 (10th Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994), as support for that proposition. In *Broadmoor,* the Court refused to find that an allegedly concealed management

contract between the seller, a Chapter 11 debtor, and the prevailing bidder was grounds to vacate the sale for bad faith, stating:

> Next, as to the said management contract, while its details were not specified, the fact of its existence between Robinson and Broadmoor was specifically set forth in the Robinson bid on which the Bankruptcy Court acted, thus negating any claim of concealment and collusion.

*Id.* at 746. *See also Dick's Clothing & Sporting Goods, Inc. v. Phar–Mor, Inc.,* 212 B.R. 283, 294 (N.D.Ohio 1997).

■ I believe that the proponents of the Sale Motion overstate the prophylactic consequence of disclosure on a determination of collusion. Under their analysis, it would appear that an agreement intending to control price that actually does control price could be blessed by a court so long as all its terms were revealed. A more sensible weighing of the role of disclosure was articulated by the court in *Kabro Associates v. Colony Hill Associates (In re Colony Hill Associates),* 111 F.3d 269, 276 (2d Cir.1997):

> Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue.

■ Applying these legal principles to the facts at hand, I turn to the agreement that the Debtor contends has controlled the sale price of the Equity Interests. The Debtor has placed no evidence into the record on the alleged collusive dealings between Wyatt and Phillips, relying on the fact that Wyatt and Phillips, previously two bidders, now are but one. As Debtor argues in his brief,

> Further, the agreement between Messrs. Phillips and Wyatt obviously would "control" the sale price of the Edwards assets, for Messrs. Phillips and Wyatt–who are the only bidders for the Edwards estate's

property—mutually have agreed to submit a single joint bid at a set price of $5.2 million. As part of this agreement, Wyatt and Phillips have stopped competing with each other in the bidding, in exchange for substantial consideration as set forth above.

Debtor's Memorandum of Law in Opposition to the New Joint Bid to Purchase His Assets ("Debtor's Memorandum") at 14. It appears from this articulation that the alleged collusive agreement is the cessation of individual bidding "in exchange for substantial consideration" under the Settlement Agreement.

This argument, while superficially appealing, cannot withstand careful analysis. It requires me to overlook the substantial and primary disputes between Phillips, Wyatt, Pilot and the Edwards Cousins being prosecuted in the New Jersey Litigation. It was always made clear to this Court that the contest for the Debtor's Equity Interests was part of a larger dispute for ownership of Pilot and the Edwards Partnership. On several occasions during the pendency of this contested matter, the parties requested adjournment of the Sale Motion to pursue a consensual resolution of this dispute. The Debtor voiced no objection to those adjournments, and participated in the discussions up until the final agreement. Given the competing interests of Wyatt and Phillips for the Equity Interests, the Debtor certainly knew, and accepted by his concurrence with the efforts towards a global settlement of all disputes, that an essential part of that resolution would be an agreement regarding the ownership of all the Pilot stock and Edwards Partnership interests, including his own. In the interim, as I anticipated in refusing to assume jurisdiction over any of the ownership issues, Debtor has been the beneficiary of the continued uncertainty over the ownership of Pilot and has watched the bidding escalate from $3.4 million to $5.2.[24]

---

24. The parties chose to provide no testimonial evidence on the final bid. Thus, Debtor's assumption that the bidding would have gone higher had the settlement not been reached at that juncture is purely speculative. Moreover, the fact that Wyatt has the resources to spend more money on the stock purchase is irrelevant. It does not follow that if he was willing to spend $5 million for the entire one third interest that he would have spent that much for equal ownership of that interest with Phillips. Nor can I draw the Debtor's adverse conclusions about the Franchisees lack of continued participation. Their teaming with Phillips in order to top the Wyatt bid was consistent with their support of Phillips and articulated wish that he remain in control of

In accepting Debtor's position, I would have to find that the bidders could only settle the larger New Jersey Litigation without addressing the purchase of the Equity Interests. That finding is the functional equivalent of prohibiting a settlement of the New Jersey Litigation. In short, it is that larger settlement, not the purchase of the Equity Interests, that is the driving force behind the Settlement Agreement and prompts the terms that Debtor claims evidence the collusive nature of the bidding– the naming and responsibilities of Phillips, who had been charged with mismanagement, as chief executive officer, president and chairman of Holding and the fixing of his salary; the role of the Wyatt and the Edwards Cousins in Holding and the fixing of their salaries; and the future employment of the Phillips law firm whose engagement had been challenged as a conflict of interest in the litigation.

There is simply no evidence that the sale price (*i.e.,* the $5.2 million bid) was the intended objective of the Settlement Agreement which merely requires Phillips and Wyatt to use their best efforts to purchase Debtor's interests at the bankruptcy sale. It is clear to me from the recitals in that document as well as the parties' requests to this Court to accommodate their efforts to reach a global settlement, that the primary goal of the agreement that resulted, *inter alia,* in the joint bid for the Equity Interests, is resolution of all disputes, so as to end costly and unproductive litigation and impart stability into the ownership and management of Pilot.

I find that the cases cited by the Debtor do not support his insistence that I deny the Sale Motion as violating the *Abbotts Dairies'* good faith requirement; indeed they compel the exact opposition result. I have previously discussed *New York Trap Rock.* Debtor also relies on *Ramsay v. Vogel,* 970 F.2d 471 (8th Cir.1992), and *In re Stroud Ford, Inc.,* 163 B.R. 730 (Bankr.M.D.Pa.1993).[25] However, Debtor fails to mention that the 8th Circuit's 1992 decision in *Ramsay v. Vogel*

merely held that § 363(n) applied to private sales as well as public auctions, and that a later decision, *Landscape Properties v. Vogel,* 46 F.3d 1416 (8th Cir.1995) *sub nom,* considered the issue on the merits and found substantial evidence supporting the jury verdict that the $350,000 payment by the purchaser to the competing bidder for withdrawal of the bid did not control the sale price. Thus, the *Vogel* decision appears to reject Debtor's notion that an agreement between joint bidders that results in a single bid in exchange for some consideration must necessarily evidence bad faith. In *Stroud Ford,* the Court found bad faith where the prevailing offeror had entered into an agreement to pay a competing bidder $18,000 to withdraw his objection to the sale based on the offer not being the highest and best bid. The court found that the objection was aimed at defeating the prevailing offer in order to open up the sale process to others, and as such the understanding, while nominally to reimburse the objector's expenses to date, "smacks of inappropriateness and could have only stifled the bankruptcy mechanism designed to ensure that the estate is fairly compensated for its assets." *Id.* at 733. These facts are far different than the facts adduced in this contested matter where neither bidder was paid to pave the way for the ultimate bid. In short, none of the legal authority proffered by the Debtor persuades me to find that the sale is not in good faith.

 Moreover, even had I reached that conclusion, a finding that an agreement was intended to control the sale price is not sufficient by itself to require disapproval of the sale. Absent a showing that the agreement actually did deprive the estate of fair value for the assets, the sale should be confirmed. The absence of a finding of good faith merely precludes the court from finding that an auction took place and treating the bidding as the "final arbiter of the value of the [debtor's] assets." *Abbotts Dairies,* 788 F.2d at 148. *Accord Colony,* 111 F.3d at 275. It then requires the court to determine

---

Pilot. Presumably the Settlement Agreement which assures Phillips continued management of Pilot removed the need for the Franchisees to invest their own money to protect their positions.

**25.** I agree that under these cases Messrs. Phillips and Wyatt are "potential bidders" as contemplated under § 363(n), a proposition not challenged by anyone.

whether the purchaser indeed is paying fair value. In this case, as I do find the sale to be in good faith, I may treat the bidding of the assets from $3.4 million to $5.2 as dispositive of fair value for the Equity Interests and claims without further discussion. Nonetheless, I will address Debtor's other objections [26] which in one way or the other, relate to whether the Trustee has secured fair value for the assets.

## II.

In *Abbotts Dairies,* the Third Circuit held that fair and sufficient consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the asset. *Id.* at 149; *Gucci,* 126 F.3d at 389. The only evidence of value of the Equity Interests was provided by the Trustee's expert Scherf who fixed a value of $2.6 on Debtor's Pilot stock and $145,000 on Debtor's interest in the Edwards Partnership. While Debtor's counsel vigorously cross-examined Scherf, he produced no other opinion of value.[27] Rather he contends that Scherf undervalued the Equity Interests by using excessive discounts for lack of control and lack of marketability and moreover that Scherf failed to normalize Pilot's earnings when he performed his analysis. Likewise Debtor contends that the Trustee failed to properly value the claims of and against Phillips, Pilot and/or Drescher

because she failed to quantify their outcome. Her evaluation, he contends, is insufficient under *Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), and its progency.[28] For the reasons that follow, I respectfully disagree.

### A.

■ *Value of the Equity Interests.* The Debtor appears to acknowledge that the discounts taken by Scherf for lack of control (10%) and lack of marketability (35%) are not a sufficient basis to object to the price secured for the Equity Interests.[29] Nonetheless, he views $5.2 million as inadequate for assets that Scherf appraised at almost one-half that number or $2,745,000. Debtor rests his claim of unfair value on Scherf's failure to normalize Pilot's earnings prior to applying the price/earnings ratio in performing his market approach analysis. Scherf, on the other hand, opined that where the appraisal involves a minority interest, proper valuation methodology does not allow for the adjustment of the balance sheet and income statement to estimate the "true economic earning power of the entity." N.T. 5/11/98 at 230–39. The underpinnings of this conclusion is the inability of a minority interest to affect the changes in a corporation that would allow it to achieve its maximum earning potential. Debtor's counsel utilized two publications,

---

**26.** Having found no bidding collusion, I similarly reject Debtor's contention that there may have been a violation of 28 U.S.C. § 152(6). I therefore find it unnecessary to address the cases advanced in support of that argument. It also follows from my decision that I find no breach of fiduciary duty by the Trustee. Rather I find that the Trustee has done specifically what she is charged to do under 11 U.S.C. § 704(1), *i.e.,* use appropriate business judgment to "collect and reduce to money property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest."

**27.** The only other reference to value of the Equity Interests is the acknowledgment in the Auten letter of an extant $6 million offer by Phillips. Exhibit M–6. That offer was apparently not all cash as it was described as $5.5 present value. Whether there were any other conditions attached to the offer is unknown. In any event, that offer compares favorably with the $5.2 million cash and claims settlement offer of Wyatt/Phillips.

**28.** On July 29, 1998, after the conclusion of the Trustee's case, Debtor filed a Request for Judgment on the Trustee's Motion to Sell his Interests in Pilot Air Freight, His Interests in the Edwards Partnership and All His Tort and Contract Claims. Doc. No. 356. Denominating the judgment requested as a "directed verdict" or "summary judgment" or simply a denial of the motion, the Debtor contended that the Trustee had not met her burden of production on the Sale Motion. That Request was obviously not granted, and the Debtor now renews certain of the points made in that pleading. *See* Debtor's Memorandum at 26.

**29.** By eliminating both discounts in full, the appraised value of the Pilot stock would have been increased to $3,962,000 using the market approach and $4,535,000 using the income approach. The Edwards partnership interests without discounts applied would be valued at $260,000. The purchase price of $5.2 far exceeds these adjusted amounts.

Herber, Schmidt and Strachota, CBA, *Fairness in Minority Interest Valuation,* Business Valuation Review 73 (Sept.1992), and Taub, *Valuing a Minority Interest: Whether to Adjust Elements of a Financial Statement Over Which the Minority Shareholder Has No Control,* Business Valuation Review 7 (March 1998), to challenge that thesis.[30] Yet, Scherf observed that they express a view contrary to his own and one that he did not believe to be generally accepted in the field. Scherf did acknowledge that where valuation of a controlling interest was performed, a normalization adjustment would possibly occur. However, Scherf was unshaken in his view that proper methodology required him to value the interests as they were being sold by the Trustee, *i.e.,* minority interests. His appraisal was blind to the identity of the purchaser because, he opined, until the sale was approved, the purchaser was unknown.

In response to Scherf's admission that where control is acquired a normalization adjustment may be appropriate, Debtor renews his valuation objection stating that the joint Wyatt/Phillips bid gives clear corporate control to the purchasers.[31] Indeed Debtor notes that the present bid scenario is even more compelling than the previous one where the intended purchaser was Phillips alone. Debtor assumes that under the current scenario it is even clearer that a controlling interest is being acquired which requires a normalization adjustment. I respectfully disagree.

▪ Even were I to concur with Debtor that Scherf's valuation must take into account the characteristics of the buyer,[32] the sale to Phillips and Wyatt gives neither majority control. Wyatt and Phillips are purchasing the stock jointly but are committed to contribute the shares to Holding along with their other shares and options. Thus, Holding will own all the shares of Pilot and interests in the Edwards Partnership. While Wyatt and Phillips through their equal interests in Holding will *together* have control of Pilot and the Edwards Partnership, their interests in Holding are equal so that neither alone has control. In recognition of the potential deadlock created by the ownership shares established under the Settlement Agreement, a detailed alternative dispute resolution process is provided, underscoring the fact that absent their total agreement, Holdings will not be able to affect change at Pilot. Wyatt's and Phillips' rights of control are in futuro as set forth in the Settlement Agreement which contemplates a shareholders' agreement that would give each a right of first refusal should a sale to a third party be entertained and, after 30 months, a "put" on the interests of the other. The price for the interests will be determined at that juncture based on the existing circumstances. In short, to the extent that a normalization adjustment is required where there is the ability to affect changes in Pilot, neither Phillips and Wyatt have that ability alone.[33] I am unwilling on this record to accept the Debtor's unsubstantiated conclusion otherwise and to reject the $5.2 bid as unfair value for the Equity Interests.

*B.*

▪ *Value of Claims Settlement.* It is well accepted that compromises are favored in bankruptcy in order to minimize the

**30.** These articles, used for the purpose of cross examination, were not moved into evidence although they were marked as Edwards Exhibits IX and X.

**31.** What the result of such an adjustment would be, other than a higher number than the $2.8 million value in the Scherf report, was not stated.

**32.** The impossibility of such a rule is apparent since the valuation precedes the auction. Indeed the change in ultimate buyer from Phillips (who would have owned a majority stake in Pilot had he been the sole purchaser) to Phillips and the Franchisees and finally to Phillips and Wyatt

underscores the Trustee and her expert's wisdom in valuing what she had to sell, not the value to a hypothetical buyer. I have no reason to reject Scherf's thesis that proper valuation methodology requires the expert to value what is being sold, and in this case, only a minority interest was for sale.

**33.** By the same token, discounts for lack of control and marketability of 10% and 35% are appropriate where there is no controlling interest but rather a 50%–50% split in ownership of a corporation. *In re Frezzo,* 217 B.R. 985 (Bankr. E.D.Pa.), *aff'd in part and appeal dismissed in part,* 225 B.R. 581 (E.D.Pa.1998).

cost of litigation to the estate and expedite its administration, and that the approval of a compromise is within the sound discretion of the bankruptcy judge.[34] In *In re Martin,* 91 F.3d 389, 392 (3d Cir.1996), the Court of Appeals outlines my task as follows:

> This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. Taking our cue from *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968), we recognize four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D.Pa.1986).

*See also Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir.1995) (*quoting In re GHR Cos.,* 50 B.R. 925, 931 (Bankr.D.Mass.1985)) ("In determining whether the compromise should be approved, the bankruptcy judge is required to 'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposed.' "). The court's role is not to conduct a trial or mini-trial, or to decide the merits of individual issues. Rather, it is to determine whether the settlement as a whole is fair and equitable. *Anderson,* 390 U.S. at 423, 88 S.Ct. 1157. Moreover, the judge is not to substitute her judgment for that of the trustee whose determination is to be accorded deference. *Martin,* 91 F.3d at 395 ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification."). *See also Hill v. Burdick (In re Moorehead),* 208 B.R. 87, 89 (1st Cir. BAP 1997). Only if the Court concludes that the settlement falls below the lowest point in the range of reasonableness should the compromise be rejected. *Pennsylvania Truck,* 150 B.R. at 601.

■ The essence of Debtor's complaint regarding the claims component of the Sale Motion is the failure of the Trustee to quantify a value of the claims mutually released based on the probability of success each party would have on each of their claims. According to Debtor, the first prong of the *Martin* test has not been satisfied here because no "probability-based quantification of the likely costs and benefits of the proposed compromise" has been performed. Debtor's Memorandum at 15. In further support of this position, he refers to his earlier pleadings. In Debtor's First Objections, he states that this "Court should simply concluded [*sic*] that the claims [asserted in the Delaware County Litigation] are "substantial" because Mr. Edwards and the lawyer who drafted the Complaint testified to that fact previously."[35] *Id.* at 45. First, I would note that neither Debtor nor Mr. Jacobsen testified in this contested matter so I have no direct knowledge of their assessment of the value of the claims. Their prior testimony in connection with other matters will not be considered. *In re Aughenbaugh,* 125 F.2d 887 (3d Cir.1942) (if party wishes to rely on papers already on file in bankruptcy proceeding, it is incumbent on him to offer it at the hearing so opponent might know that it is being relied upon and be able to meet it with

---

**34.** Bankruptcy Rule 9019 governs the procedure for securing the bankruptcy court's approval of a compromise. In this case, the settlement occurs as part of the Sale Motion, obviating a separate Rule 9019 motion. However, the principles are the same without regard to the procedural vehicle. *In re Pennsylvania Truck Lines, Inc.,* 150 B.R. 595, 599 (E.D.Pa.1992) (settlement of controversy over conflicting claims does not constitute sale of that property), *aff'd,* 8 F.3d 812 (3d Cir.1993). *Accord In re Neshaminy Office Bldg. Assoc.,* 62 B.R. 798, 805 (E.D.Pa.1986).

**35.** Another reason proffered in support of the Court's simply concluding that the claims are substantial is that the lawyer, Kenneth Jacobsen, Esquire was willing to take the case on a contingency basis. Needless to say, the retention agreement between Debtor and Jacobsen is not part of this record nor would it, without more, dictate my view of the value of the claim.

such other evidence as may be available to him). Indeed the only indication I have of the Debtor and Mr. Jacobsen's views about these claims is from the Trustee's testimony. The Trustee most appropriately interviewed both men on this subject and concluded from their statements that the Debtor's claims against Pilot were asserted as leverage to maximize the value he could secure in a buyout of his stock. The folly of prosecuting those claims was underscored by the Auten letter upon which the Trustee also relied in concluding that the Debtor's claims did not have independent value beyond the value of the Phillips Group claims being asserted against the estate.

Debtor also claims that his other claims, i.e., those memorialized in Adversary No. 98–133, were not properly quantified. Debtor advises that they are "derivative of the claims being litigated between others" in the New Jersey Litigation. As noted earlier, Debtor is not a party to that litigation, and the parties to it have reached a settlement which, of course, they are free to do without Debtor's consent or joinder. I fail to understand how the Trustee could have ascribed value to those claims. This conclusion is underscored by the fact that Debtor contends that these are his claims and not claims of the estate to be administered by the Trustee.[36]

Admittedly the Trustee did not fix a percentage recovery on the Edwards claims being released. Presumably to do so she would have had to retain her own expert at additional cost and delay to the estate. Rather she was satisfied by the evaluations of two of the Debtor's own attorneys, Jacobsen and Auten, that it was imprudent to pursue these claims. This judgment was underscored by her awareness of the role the litigation played in the Debtor's efforts to maximize the value of his shares. I find this analysis sufficient to satisfy the Trustee's duty to assess the likelihood of success in the litigation.

The Trustee, like Mr. Auten before her, was concerned that a protracted lawsuit against the corporation whose financial health gave value to her asset would be self-defeating. Thus, the second *Martin* prong, i.e., collectability of a judgment, counseled against rejection of the settlement.

The third factor, the complexity of the litigation and the expense, inconvenience and delay attendant to it, most significantly compels settlement. The Trustee reviewed the pleadings and spoke with the attorneys involved in the Delaware County Litigation; as to Pilot's claims against the estate, she likewise reviewed documents, including expert reports prepared in support of the multimillion dollar defamation claim[37] and interviewed Pilot's lawyer. As a result of her investigation, she concluded:

> Now, I would have to say that in all my years as trustee–being a trustee–[38] I have never found a case more complex than this one. All I need to do is to look out in this room and I could see the best of the best are here today and that would certainly continue far into the future in the event the litigation does proceed.

*Id.* at 27. Based on her interviews, she had observed that there were very strong views with regard to the various claims, underscoring her conclusion that any litigation would be extremely protracted and expensive.[39]

---

**36.** Debtor filed an objection to the Trustee's Motion to Intervene in Adversary No. 98–133. That Motion is, like others mentioned before, being held in suspense pending the outcome of the Sale Motion. Notably, in his proposed Order approving the Sale Motion, the Trustee seeks an Order releasing the claims asserted in the Delaware County Litigation but not those asserted in this adversary case.

**37.** She noted her concern that a successful defamation claim could seriously impact the distribution to creditors. *Id.* at 25. With an offer that promised 100% recovery to unsecured creditors and a multimillion distribution to Debtor on his equity, she concluded that the risk could not be justified.

**38.** Ms. Shubert testified that she has been a trustee since 1986, administering almost 8,000 bankruptcy cases of which 500 were asset cases. She has handled millions of dollars as trustee. N.T. 6/17/98 at 5–6.

**39.** The Trustee acknowledged on cross-examination her belief that Jacobsen would represent the estate on a contingent fee basis. Thus, the Trustee would not have to advance legal fees although the costs might otherwise deplete the funds on hand.

The last *Martin* factor requires consideration of the paramount interests of creditors. The outstanding claims are the only impediment to the immediate payment to creditors of one hundred percent of their allowed claims. The alternative is delay beyond the already three years they have waited through the Debtor's two Chapter 11 cases and the instant Chapter 7 case. It has taken eight months to bring this Sale Motion to conclusion because of the complexity of the claims and the litigious nature of the parties. The process has been a productive one, however, because it has brought an additional one million dollars of value to the estate. That value is available solely to the Debtor yet he would hold out for more at the expense of a prompt distribution to creditors. He claims the Trustee is abandoning her duty to him for the expedience of closing the case. I respectfully disagree.

In *In re Kay*, 223 B.R. 816 (Bankr. M.D.Fla.1998), the bankruptcy court analyzed a Chapter 7 trustee's respective duties to creditors and the debtor in a context similar to the one before me now. At issue was the Trustee's proposed settlement of an appeal of an order authorizing the sale of certain property which was an impediment to closing on the property sale. The Debtor objected to the compromise and the sale motion. The court identified the same factors as I have in order to determine whether the settlement was fair and equitable. Focusing on the fourth factor, *i.e.*, the paramount interest of creditors, the court noted that a majority of creditors supported the proposed settlement and no creditor had objected based upon a 100% distribution. The task for the court was to weigh the unsecured creditors' interests with the adverse impact the sale of the property would have on the debtor. Discussing this issue, the bankruptcy court stated:

A Chapter 7 Trustee has the duty to preserve estate assets for the benefit of creditors who will share in distribution of the estate and is obligated to gather and liquidate assets in an efficient manner in performing this duty to creditors. *The Trustee's duties to the Debtor are not on the same plateau as estate creditors, even though there are mutual obligations to estate creditors and Chapter 7 Debtor. See e.g., In re Davis*, 899 F.2d 1136, 1143 n. 15 (11th Cir.1990) ("[t]he bankruptcy trustee does not represent the interests of the debtor alone; rather he owes a complex set of obligations and fiduciary duties to the court, the debtor ... and, most importantly, the creditor.") (citations omitted).

*Id.* at 820 (emphasis added). Applying this principle to the facts, the court found that the settlement at issue which gave a noncreditor a valid lien on the debtor's property was incompatible with the trustee's duty to preserve distribution of the debtor's interest. Rather the court found that a prior court approved sale of property that provided a one-hundred percent distribution to creditors, allowed the estate to close its affairs without the risk of incurring additional expenses and provided a significant distribution to the debtor was in the best interest of creditors.

Unlike the trustee in *Kay*, Trustee Shubert has no confirmed sale to fall back on to assure a total distribution to creditors should the settlement not be approved. Rather rejection of the settlement puts at risk the value of the asset and a prompt and perhaps full distribution to creditors. Given the escalation of the price offered for the Equity Interests from $4.2 to $5.2 million for assets appraised at $2,745,000 which inured completely to Debtor's benefit, I find that approval of the settlement represents an appropriate balancing of the paramount interests of creditors with those of the Debtor. While no one will ever know whether any additional dollars would have been forthcoming from Wyatt and/or Phillips, the prejudice to creditors in rejecting the settlement in favor of more costly and protracted litigation and the possible loss of the $5.2 million cash offer for the Equity Interests is too great.

Thus, taking all of the required *Martin* factors into account, I find no basis to conclude that the Trustee's judgment should be overruled. In short, the Sale Motion shall be approved.

An order consistent with the foregoing Memorandum Opinion shall issue.

**572**

## ORDER APPROVING TRUSTEE'S SALE PURSUANT TO 11 U.S.C. SECTION 363

AND NOW, this 15th day of Dec., 1998, upon consideration of the Trustee's Motion to Approve the Sale of Stock and Other Assets of the Debtor, John J. Edwards' Estate, (the "Debtor"), Pursuant to 11 U.S.C. Section 363 and any response thereto; and

FURTHER, upon consideration of the Debtor's Objections to said Motion and for the reasons stated in the accompanying Memorandum Opinion which constitute my findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052 and 9014; it is hereby

ORDERED AND DECREED that:

1. The Trustee's motion is GRANTED and the Trustee upon receipt of the consideration described below (the "Consideration") from the joint bidders, Richard G. Phillips and Aaron Wesley Wyatt (the "Buyers") is authorized to sell, transfer, convey and/or provide to the Buyers free and clear of all debts, liens, encumbrances, restrictions and any and all other interests, the following real and/or personal property of the Debtor's Estate (the "Assets"):

(i) a thirty-three and one-third percent (33 1/3%) stock ownership interest in Pilot Air Freight Corporation, a Pennsylvania Corporation, (the "Corporation") and any and all rights that the Debtor owns, possesses or enjoys pursuant to a Shareholders Agreement (the "Shareholders Agreement") dated January 31, 1994, by and between the Debtor, Thomas Edwards, William Edwards, Pilot Air Freight Corporation, A. Wesley Wyatt and Richard G. Phillips (the "Stock Interest") and;

(ii) a thirty-three and one-third percent (33 1/3%) partnership interest, (the "Partnership Interest") in the Edwards Partnership, a Pennsylvania Partnership and all of the Debtor's interest in the assets thereof, (the "Partnership") (the aforesaid Stock and Partnership Interest hereinafter sometimes referred to collectively as the "Assets"); and

(iii) a release of all claims and causes of actions of the Debtor that are in any way related to the Defendant's ownership interest in, employment by or other relationships with the Corporation and/or the Partnership, including but not limited to all claims that were asserted or could have been asserted against Pilot Air Freight Corporation, Richard G. Phillips, Esquire, Richard G. Phillips Associates, P.C., A. Wesley Wyatt, Wyatt, Inc., Michael Schwartz, Pilot Industrial Corporation, and the Edwards Partnership in the State Court action pending in the Court of Common Pleas of Delaware County as *John J. Edwards individually and derivatively on behalf of Pilot Air Freight Corporation and on behalf of the Edwards Partnership v. Pilot Air Freight Corporation, Richard G. Phillips, Esquire, Richard G. Phillips Associates, P.C., A. Wesley Wyatt, Wyatt, Inc., Michael Schwartz, and Pilot Industrial Corporation ("Defendants") and Pilot Air Freight Corporation and Edwards Partnership ("Nominal Defendants")*, Case No. 96–12093 (the "State Court Action") (Collectively, the "Debtor's Claims").

2. The consideration to be provided by the Buyers to the Trustee consists of the following:

(i) payment of the sum of $5,200,000.00 to be paid to the Trustee by the Buyers at a closing.

(ii) a release by Richard G. Phillips of the claims he has asserted against the Debtor and the Debtor's Estate in this bankruptcy proceeding, styled as *Richard G. Phillips v. John J. Edwards*, Adversary No. 97–0040 (the "Buyer's Adversary Proceeding"), and as proof of claim no. 9 in an unliquidated amount (collectively the "Buyer's Claims");

(iii) a release by the Corporation of the claims the Corporation has asserted against the Debtor and the Debtor's Estate in this bankruptcy proceeding styled as *Pilot Air Freight Corp. v. John J. Edwards*, Adversary No. 97–0035 (the "Corporation's Adversary Proceeding")

and as proof of claim no. 15 (collectively the "Corporation's Claims");

(iv) a release by Richard G. Phillips Associates, P.C. (the "Firm") of the claims the Firm has asserted against the Debtor and the Debtor's Estate in this bankruptcy proceeding styled as proof of claim no. 12 in the amount of $15,000.00 (the "Firm's Proof of Claim");

(v) a release by Andrew Drescher ("Drescher") of the claims Drescher has asserted against the Debtor and the Debtor's Estate in the proof of claim filed in this bankruptcy proceeding; and

(vi) a release by A. Wesley Wyatt ("Wyatt") of the claims Wyatt has asserted against the Debtor and the Debtor's Estate in the proof of claim filed in this bankruptcy proceeding; and

(vii) reimbursement of the Trustee's federal tax liability *

3. The consideration set forth in the Agreement which includes the payment of $5,200,000 and the release of the Buyer's Claims, the Corporation's Claims, the Firm's Claims, Drescher's Claims and Wyatt's Claims and the Tax Payment is the highest and best offer that the Trustee has or will receive and constitutes a purchase in good faith and for fair value by the Buyer within the meaning of Section 363(m) of the Bankruptcy Code and *In Re Abbotts Dairies of Pennsylvania,* 788 F.2d 143 (3rd Cir.1986). Furthermore, this Court finds that the aforesaid consideration set forth in the Agreement exceeds the lowest range of reasonableness standard of *In re Martin,* 91 F.3d 389 (3rd Cir.1996) and *In Re: Neshaminy Office Building Associates,* 62 B.R. 798 (E.D.Pa. 1986) for the release of the Debtor's Claims by the Trustee as provided for in the Agreement and it is in best interest of the Debtor's Estate to release said claims.

4. The Trustee is hereby authorized to consummate the transactions as provided herein including the transfer of the Stock Interest and Partnership Interest together with the release of the Debtor's Claims.

* resulting from her ownership of the shares of Pilot Air Freight Corporation, an "s" corporation

5. As a result of the mutual release of claims that it part of the assets sold and consideration received, the proofs of claims referenced in paragraph 2 above (*i.e.,* Claim Nos. 9, 10; 12 and 15) are withdrawn with prejudice and the adversary proceedings referenced in paragraphs 2 and 3 (Nos. 97–0035, 97–0039, 97–0040) are marked settled. The Clerk of Court is directed to close the foregoing adversary cases.

6. As this Order authorizes the sale of the Debtor's remaining assets and provides for the settlement of all disputed claims, the Motion of the Debtor to Dismiss this Chapter 7 case or Reconvert it to a Case Under Chapter 11 is **MOOT.**

7. With respect to Adversary No. 98–0133, it is hereby ordered that the Debtor shall appear and show cause at a hearing to be held on **January 19, 1998** at 9:30 a.m. in the Robert N.C. Nix, Sr. Federal Courthouse, 2nd flr., 900 Market Street, Courtroom # 3, why (1) the Trustee's Motion to Intervene is not moot by reason of his release of all claims the estate holds against the defendants therein and (2) to the extent the remaining claims asserted in that action are claims of the Debtor and not property of the estate, why this adversary case should not be dismissed.

and its undistributed profits ("Tax Payment").